**UNITED STATES of America**

v.

**Cecil McDonald DAVIS, Defendant.**

**Crim. A. No. 94–370–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 10, 1995.

Helen Fahey, U.S. Atty., Michael Rich, William Palmer, Asst. U.S. Attys., Alexandria, VA, for plaintiff.

Donald Criswell, Arlington, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

Under 18 U.S.C. § 844(f), it is a federal crime to commit arson in respect of a property "owned, possessed, or used by, or leased to ... any institution or organization receiving Federal financial assistance." A federal jury convicted defendant Cecil Davis of four

charges based on this crime as a result of his participation in an arson committed at a townhouse leased to a person receiving Section 8 assistance.[1] Davis's convictions are valid only if the townhouse was "owned, possessed, or used by, or leased to" an agency receiving federal funding. In this instance, the agency receiving federal funding was the Virginia Housing Development Authority (VHDA), and the question presented is whether VHDA "used"[2] the townhouse by making monthly housing assistance payments to the townhouse's owner on the lessee's behalf. Because the statute's language and purpose compel the conclusion that VHDA "used" the townhouse within the meaning of § 844(f), Davis's convictions are valid and his motion for judgment of acquittal on each charge must be denied.

### I.[3]

The government alleges that Davis was a member of the "133 Crew," a small group distributing drugs in Leesburg, Virginia. The 133 Crew's illegal activities occurred chiefly at the home of Tiffini Fairfax at 133 Fort Evans Road in Leesburg. On December 5, 1993, Fairfax sold drugs to Brenda Williams at this location. The next day, the Leesburg Police Department raided Fairfax's home. Although the police found no drugs and made no arrests, their search resulted in Fairfax's three children being taken into custody by child welfare authorities on the ground of apparent neglect. Davis was not present at the time of the raid.

Fairfax soon came to believe that Williams was cooperating with the police, and that this cooperation had led to the raid of her home and the loss of her children. In retaliation, Davis, Fairfax, and others agreed on a plan to set fire to Williams' townhouse. Davis convinced Walter Langston, another individual who frequented the Fort Evans Road house, to set the fire in return for crack cocaine. Davis purchased a gasoline can, and gave Langston money to purchase gloves and a hat for purposes of disguise. On December 11, 1993, Langston went to Williams' townhouse and poured gasoline on her back porch, but was interrupted by a neighbor before he could set the fire and thus abandoned his efforts. Despite the failure of this attempt, Fairfax gave Langston a $50 rock of crack cocaine for his efforts.

The next day, December 12, Davis and his co-conspirators agreed that Langston would try again, this time using a "Molotov cocktail."[4] Langston, with money from Davis, purchased gasoline, and used it to manufacture the explosive device from a malt liquor bottle and strip of bed sheet. Early in the morning of December 13, Langston again went to Williams' townhouse, lit the "cocktail" and threw it at the townhouse. It landed and exploded on Williams' back porch, setting fire to a piece of carpet on the porch, scorching the exterior wall, and shattering a sliding glass door. The three individuals in the townhouse at the time, including Williams, were not injured, and the fire was promptly extinguished.

A federal grand jury indicted Davis on four counts arising from the arson. Jurisdiction for each count is premised on 18 U.S.C. § 844(f), which makes it a federal criminal offense to commit arson on property "owned, possessed, or used by, or leased to" an institution or organization receiving federal financial assistance.[5] Specifically, the indictment

---

1. Section 8 assistance refers to low-income housing programs pursuant to 42 U.S.C. § 1437f. *See infra* p. 4.

2. The government does not contend that VHDA "owned," "possessed," or "leased" the townhouse, and therefore these statutory terms are not in issue.

3. On motions for judgment of acquittal, courts must view the evidence in the light most favorable to the government. *See Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978); *United States v. Sawyer,* 294 F.2d 24, 31 (4th Cir.), *cert. denied,* 368 U.S. 916,

82 S.Ct. 196, 7 L.Ed.2d 132 (1961). The recitation of facts presented here follows this principle.

4. A "Molotov cocktail" is a crude incendiary bomb consisting of a bottle filled with flammable liquid and a piece of cloth used as a wick.

5. Section 844(f) of Title 18 provides, in pertinent part, that:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or *used by,* or leased to,

charged Davis with (i) conspiring with Fairfax, Langston, and others to commit the § 844(f) arson, in violation of 18 U.S.C. § 371, (ii) attempting the arson on December 11, in violation of § 844(f), (iii) committing the arson on December 13, in violation of § 844(f), and (iv) using a firearm or destructive device in committing a violent crime subject to prosecution in federal court, namely the § 844(f) arson, in violation of 18 U.S.C. § 924(c)(1). All four charges are premised on the applicability of § 844(f). If § 844(f) is inapplicable, the charges fail jurisdictionally.

The government contends § 844(f) applies because Brenda Williams received Section 8 housing assistance. Under Section 8 of the United States Housing Act of 1937, the United States Department of Housing and Urban Development (HUD) distributes funds to local public housing agencies, including VHDA, for use in connection with low-income housing assistance. *See* 42 U.S.C. § 1437f. Eligible families select housing and VHDA, after approving the unit and the lease, promises to make monthly housing assistance payments to the landlord on the family's behalf. *Id.*

Pursuant to this program, Williams leased the townhouse where the arson occurred from Page–Brooke Land Trust ("Page–Brooke"). Four documents were executed on September 1, 1992, the date Williams began her tenancy. First, Williams and Page–Brooke's agent signed a lease providing for monthly rent payments of $625. No one from HUD or VHDA signed the lease, and the document does not mention the Section 8 program. In the lease, Williams agreed to use the townhouse for residential purposes only. Second, Williams and Page–Brooke's agent signed a "Certificate Addendum" to the lease, which is a HUD form describing the terms of Williams' housing assistance and restricting the landlord's ability to terminate the lease. Third, Williams and a VHDA official executed a "Certificate of Family Participation," another HUD form, indicating that VHDA had determined Williams was eligible for Section 8 assistance.

This form does not specifically identify the property rented. In it, Williams agreed to permit VHDA to inspect the townhouse "at reasonable times and after reasonable notice." And fourth, VHDA and Page–Brooke entered into a "Housing Assistance Payments Contract," also a HUD form, in which VHDA promised to make monthly housing assistance payments of $594 to Page–Brooke on Williams' behalf. This left a tenant rent of $31 per month to be paid by Williams. The contract required Page–Brooke to ensure that Williams used the unit solely as her family's principal residence. Under the contract, VHDA maintained the right to inspect the townhouse annually or as necessary to confirm that the townhouse remained in a safe and sanitary condition and that the landlord complied with the lease's terms. The contract further provided that if Williams vacated the townhouse in violation of the lease, VHDA would become liable, under certain conditions, for 80% of the rent for up to two months.

Davis's trial commenced on November 21, 1994. At the conclusion of the government's case, Davis moved for a judgment of acquittal on all four counts pursuant to Rule 29(a), Fed.R.Crim.P. In support of his motion, Davis argued that the evidence presented disclosed an absence of subject matter jurisdiction under 18 U.S.C. § 844(f) because no organization or institution receiving federal financial assistance owned, possessed, used, or leased Brenda Williams' townhouse. In response, the government argued that VHDA used the property within the meaning of § 844(f). The Court denied the motion, allowing defendant leave to renew in the event the jury's verdict was adverse to him. Following the presentation of defendant's case and the Court's instructions, the jury deliberated and returned guilty verdicts on all four counts. Defendant thereafter renewed his Rule 29 motion. The matter, having been fully brief, is now ripe for disposition.

the United States, any department or agency thereof, or *any institution or organization receiving Federal financial assistance* shall be

imprisoned for not more than ten years, or fined not more than $10,000, or both....

## II.

██ Statutory interpretation properly begins with the statute's language. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Section 844(f) applies to fires and bombings that damage property "owned, possessed, or used by, or leased to" the United States or federally-funded organizations or institutions. The sole question presented here is the meaning of the word "used," and specifically whether VHDA "used" Williams' townhouse within the meaning of the statute.[6] It is a settled axiom of statutory construction that nontechnical, undefined words in a statute are normally given their plain or ordinary meaning. *See Chapman v. United States*, 500 U.S. 453, 462, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). The term "used," in this statute, is both nontechnical and undefined. Thus, the task here is to give "used" its plain or ordinary meaning.

Dictionaries are often used by courts as aids to divining plain and ordinary meaning.[7] A recent, notable example of this is *Smith v. United States*, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). There, the Supreme Court construed the verb "use" in the context of 18 U.S.C. § 924(c)(1), which provides for enhanced punishment when a defendant "uses or carries" a firearm in committing a violent or drug-related federal crime.[8] In that case, the defendant was convicted under § 924(c)(1) for attempting to trade a MAC–10 automatic firearm for cocaine. The Supreme Court upheld the conviction, ruling that the trade was a "use" of the MAC–10. In reaching this conclusion, Justice O'Connor, speaking for a majority of the Court,[9] consulted various dictionaries and found that "to use" is variously defined as "to employ," "to utilize," "to convert to one's service," "to make use of," "to avail oneself of," or "to carry out a purpose or action by means of." *Id.* at ——, 113 S.Ct. at 2054.[10] Given these dictionary definitions, it followed that because Smith employed and derived service from the MAC–10 when he attempted to trade it for narcotics, he "used" the gun within the meaning of § 924(c)(1). *Id.*[11]

██ VHDA's actions with respect to Williams' townhouse fall well within the dictionary definitions of "used" sanctioned by *Smith*.[12] The purpose of Section 8, and of

---

6. The fact that Williams used the townhouse as a residence is not determinative; it does not foreclose the possibility that VHDA also might have "used" the property in some other sense that might qualify under § 844(f).

   It should be noted that the government does not contend that Williams' use of the townhouse satisfies § 844's requirements. While she arguably received federal financial assistance via the Section 8 program, she is not, as required, an "organization or institution."

7. For an interesting discussion of the pitfalls in using dictionary definitions in statutory interpretation, see Cunningham, et al., *Plain Meaning and Hard Cases*, 103 Yale L.J. 1561, 1614–16 (1994).

8. Davis was charged in Count 4 of the indictment, and subsequently convicted, of violating § 924(c)(1) by using a destructive device in relation to a violent criminal offense, the § 844(f) arson.

9. Justice Scalia filed a dissenting opinion in which two Justices joined. *See* —— U.S. at ——, 113 S.Ct. at 2060.

10. Justice O'Connor also noted that an earlier Supreme Court had defined "use" to mean "to employ" or "to derive service from." —— U.S. at

——, 113 S.Ct. at 2054 (citing *Astor v. Merritt*, 111 U.S. 202, 213, 4 S.Ct. 413, 419, 28 L.Ed. 401 (1884)).

11. The *Smith* majority, as well as the government in this case, defines the word "used" quite broadly. It suggests that one may "use" property even though one does not tangibly or directly do anything to, or with, the property. Yet, the facts in *Smith* did not require the Supreme Court to reach the question whether "used" should be construed so broadly, since Smith possessed and physically handled the gun in seeking to trade it for drugs. In challenging his conviction, Smith essentially conceded that he "used" the gun as an item of barter, but contended that this use was not one of the uses contemplated by § 924(c)(1). Instead, he contended that § 924(c)(1) is violated only when a firearm is used for its familiar and intended purpose, that is, as a weapon. *See* —— U.S. at —— – ——, 113 S.Ct. at 2054–57. The Court rejected Smith's contention that "use" necessarily or ordinarily means "use for its intended purpose." *Id.*

12. Even the dictionary entries cited by defendant support the *Smith* Court's construction of "used." For example, defendant notes that the non-technical definition of the noun "use" in *Black's Law Dictionary* states that "[t]he 'use' of a thing means that one is to enjoy, hold, occupy,

VHDA's participation in the program, is "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). When Williams selected a property she wished to lease, VHDA executed two documents, a certificate in which it declared Williams' eligibility for Section 8 assistance, and a contract with Page–Brooke in which it promised to make monthly housing assistance payments. Thereafter, VHDA made payments each month to the townhouse's owner on Williams' behalf. Thus, VHDA used the townhouse to ensure that Williams, who was eligible for federal housing assistance, enjoyed suitable housing. In so doing VHDA "used" the property in the dictionary sense, because it derived service from, availed itself of, and carried out its purpose by means of, the property. And because dictionaries reflect the plain and ordinary meaning of terms, it follows that VHDA "used" the townhouse within the plain and ordinary meaning of that term.

■ Of course, statutory language must be interpreted in its statutory context. *See Smith,* —— U.S. at ——, 113 S.Ct. at 2054.[13] Defendant argues that the meaning of "used" in § 844(f) is not necessarily identical to its meaning in § 924(c)(1). But this point, though generally valid, does not diminish the persuasiveness of *Smith* in deciding the question presented here. In *Smith,* Justice O'Connor first considered the plain and ordinary meaning of "used" in general, and then examined the remaining language of § 924(c)(1), finding that the context in which "used" appears in § 924(c)(1) does not alter the plain and ordinary meaning of the term. *Id.* at —— —— ——, 113 S.Ct. at 2054–58. The same is true here; the context in which "used" appears in § 844(f) does not alter the plain and ordinary meaning of the term. There is nothing about arson in respect of a property used by a federally-funded organization that would dictate giving the term "used" a narrow, specialized, or restrictive meaning. Nor is a different result dictated by canons of statutory construction focusing on statutory context, such as *noscitur a sociis* and *ejusdem generis.*[14] These canons hold that the meaning of an ambiguous term may be determined by reference to other terms accompanying it in the statute. In § 844(f), "used" appears within the phrase "owned, possessed, or used by, or leased to." Thus, the canon, assuming its applicability here,[15] would require the term "used" to be limited to the exercise of some type of property right, and not merely to the enjoyment of a benefit, since "owned," "possessed," and "leased" each denote certain property rights.[16] Yet even if the term "used" in § 844(f) were construed to require posses-

---

or have some manner of benefit thereof." *Black's Law Dictionary* 1710 (4th ed. 1951) (emphasis added). VHDA enjoyed some manner of benefit from the townhouse.

**13.** Words often have multiple meanings, and the same word may have different meanings in two different statutes. *Deal v. United States,* —— U.S. ——, ——, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993). Thus, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Id.*

**14.** *Noscitur a sociis,* meaning "it is known from its associates," is a principle of statutory interpretation providing that the meaning of doubtful words may be determined by reference to associated words and phrases in the statute. *See Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). *Ejusdem generis* is an illustration of the *noscitur a sociis* principle, and provides that where an enumeration of specific words is supplemented by a more general reference, the general term may be

limited to the class suggested by the enumerated words. *See Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). Thus, the two principles produce identical results. *See 2A Sutherland Statutory Construction* § 47.16 (1984).

**15.** *Noscitur a sociis* and *ejusdem generis* are canons of construction designed to help ascertain a term's meaning when there is uncertainty; but they are not to be used to create uncertainty where, as here, none exists. *See Russell Motor Car Co. v. United States* 261 U.S. 514, 519, 43 S.Ct. 428, 429–30, 67 L.Ed. 778 (1923) (*noscitur a sociis*); *Garcia v. United States,* 469 U.S. 70, 74, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) (*ejusdem generis*). Here, the Supreme Court's decision in *Smith* provides clear guidance as to the plain and ordinary meaning of "used."

**16.** By contrast, the words "owned," "possessed," and "leased" do not necessarily suggest that VHDA must be physically present on the property it "uses." One may certainly own or lease property on which one is never physically present.

sion of a right or interest recognized in property law, § 844(f) would still apply in this case because VHDA possessed a property right in the townhouse. Under the terms of the HUD forms executed along with Williams' lease, VHDA possessed the right to inspect the townhouse as often as necessary to ensure compliance with Section 8's standards.[17] Thus, the inspection right constitutes a property right in the townhouse, namely a license, that allowed VHDA officials to enter the property on certain conditions for a specific purpose. *See generally* 25 *Am. Jur.2d Easements and Licenses* (1966).[18] In sum, therefore, the application of *noscitur a sociis* or *ejusdem generis* principles supports, rather than contradicts, the conclusion that VHDA "used" the townhouse and that § 844(f) is applicable.[19]

■ It is also important to consider whether this conclusion is consistent with the congressional purpose underlying § 844(f). For it is well settled that proper statutory interpretation must respect Congress's purpose for enacting the statute in question. *See Dowling v. United States,* 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985).

Congress enacted § 844(f) as part of Title XI of the Organized Crime Control Act of 1970. Pub.L. No. 91–452, § 1102(a), 84 Stat. 956. Title XI established a scheme for federal regulation of interstate and foreign commerce in explosives, and in so doing, created a number of new federal crimes relating to the use, transportation, and possession of explosives. H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4011. While destruction of federal property was already a federal crime, Congress enacted § 844(f) to stiffen the penalties where explosives are used because of their tremendous destructive power and threat to life and limb. *Id.* at 4046. Section 844(f), in particular, protects the United States' interests in federally-funded agencies and their activities. *Id.* These interests, for example, are implicated where a person with an animus toward Section 8 housing attempts to drive Section 8 aid recipients out of the neighborhood by fire bombing their housing. It is easy to understand why Congress, seeking to protect the Section 8 program, would enact a statute to extend federal criminal jurisdiction to this situation. Yet the bombing of Williams' townhouse by Davis and his co-conspirators is distinguishable from the hypothetical in only one respect: the defendant's motive, which is a factor immaterial under § 844(f). The applicability of § 844(f) does not turn on the arsonist's motivation. In both the hypothetical example and the case at bar, the end result is the same: Section 8 housing is threatened or destroyed. In both situations, congressional purpose is furthered by giving the term "used" its plain and ordinary meaning so that § 844(f) reaches the case at bar.

### III.

Defendant raises several counterarguments which, while they are of some force, do

---

17. VHDA's right to inspect appears in paragraph (5)(A)(2) of the "Certificate of Family Participation" and in paragraphs (4)(B) and 12(B) of the "Housing Assistance Payments Contract." *See supra* p. 5.

18. While it is difficult to distinguish between a written, irrevocable license and an easement, VHDA's inspection right appears to constitute the former. Licenses and easements each provide some right to enjoy property of another. Virginia law distinguishes a license from an easement on the ground that a license is personal and cannot be assigned, and a license does not entail an interest or estate in the land. *See Bunn v. Offutt,* 216 Va. 681, 222 S.E.2d 522, 525 (1976); *see also Paul v. Blakely,* 243 Iowa 355, 51 N.W.2d 405, 407 (1952) (describing the circularity of such distinctions). Here, it is obvious that the parties intended that VHDA's right to enter the property was uniquely applicable and person-

al to it, and could not be transferred, and therefore constituted a license.

19. The government presents one additional argument regarding the language of § 844(f) that is unavailing. It argues that if "used" is interpreted more narrowly than it proposes, the word becomes redundant surplusage. This is clearly not so, since it is easy to envision "uses" that inarguably fall within § 844(f), but that are not covered by the terms "possessed," "owned," or "leased." For example, the government might possess an easement across private property that it routinely uses to transport troops and equipment to a military base. Or, a corporation subject to an extensive tax audit might make an empty office available to IRS agents reviewing its records. Thus, even under the defendant's restrictive interpretation, "used" is not without meaning.

not alter the conclusion compelled by the plain meaning and purpose of § 844(f). Each is treated separately.

### A.

Defendant accurately points out that the legislative history of § 844(f) demonstrates that the statute's drafters did not have Section 8 housing in mind. There is no evidence that anyone in Congress gave thought to whether the statute would apply to this situation.[20] The legislative history states that Congress extended § 844(f) to include property of institutions and organizations receiving Federal financial assistance in order "[t]o permit the Federal Government to more directly participate in the investigation and prosecution of the recent rash of attacks on ROTC facilities and other buildings on college campuses culminating in the tragedy at the University of Wisconsin." H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. at 4046.[21] Thus, § 844(f) was enacted to provide federal jurisdiction over bombings at locations such as "universities, hospitals, and police stations." *Id.* at 4014. The legislative history mentions only property owned and actually occupied by federally-funded entities.[22] It provides no guidance as to the scope of the statute's protection of property that is merely "used" by such entities.

■ The fact that legislative history reflects that Congress did not consider the instant application of the statute neither supports nor refutes the government's current interpretation of the statute. In any event, when a criminal statute's language is unambiguous, "only the most extraordinary showing of contrary intentions" from legislative history justifies limiting the plain and ordinary meaning of statutory language. *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984). Here, the legislative history contains no guidance as to the meaning of "used" in § 844(f), let alone an "extraordinary showing" in defendant's favor.

Defendant also argues that the legislative history demonstrates Congress's sensitivity to maintaining a properly limited federal role in investigating and prosecuting arson. The House Report indicates that "it is not the intention of the proposed statute that the Federal Government substitute for the enforcement activities of State and local authorities." H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. at 4014.[23] Defendant contends that this legislative history reinforces the general rule that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). Courts generally presume that Congress does not define federal crimes to include conduct already well covered by state criminal laws. *Id.* So, defendant argues, the government's interpretation of § 844(f), which would expand federal criminal jurisdiction to cover arson of Section 8

---

**20.** It is a telling, if not devastating, comment on today's legislative process that the applicability of § 844(f) to Section 8 housing was not considered by any of 435 Congressmen and 100 Senators plus the numerous lawyers and legislative specialists who serve on their staffs and on congressional committee staffs. This legislative omission is all the more surprising given that the application of § 844(f) to Section 8 housing can hardly be termed unforeseeable.

**21.** The House Report refers to the August 1970 bombing of the Army Mathematics Research Center at the University of Wisconsin. *See United States v. Brown,* 384 F.Supp. 1151, 1154 (E.D.Mich.1974), *rev'd on other grounds,* 557 F.2d 541 (6th Cir.1977).

**22.** The House Report repeatedly describes § 844(f) as reaching premises and property "belonging to" institutions or organizations receiving federal financial assistance. *See* H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. at 4014, 4046. Since the statute includes the terms "used" and "leased," it clearly must reach some property that does not "belong to" federally-funded organizations, and so the House Report's paraphrase of the statute's reach is necessarily an incomplete one.

**23.** Congress reflected the same sentiment in the statute itself, at 18 U.S.C. § 848, providing that the federal criminal statutes on explosives "shall [not] be construed as indicating an intent on the part of the Congress to occupy the field ... to the exclusion of the law of any State on the same subject matter." Section 848 expressly provides only that, however broadly the federal arson statutes reach, they should not be construed to curtail concurrent state law enforcement.

housing, is disturbing because it is unlikely Congress intended broad federalization of the traditional common-law crime of arson.

Defendant's argument, while initially appealing, is torpedoed by another subsection of the statute. Section 844(i) prohibits malicious burning or bombing of property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Congress plainly indicated its intention that § 844(i) reach to the maximum extent permitted by the Commerce Clause, thereby resulting in "a very broad provision covering substantially all business property." H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. at 4046. And indeed, § 844(i), understandably, has been broadly construed by courts. The Supreme Court has held that, although § 844(i) does not apply to all private homes, it does apply to all rented properties because "rental of real estate is unquestionably" an activity affecting interstate commerce. *Russell v. United States,* 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985).[24] Because all Section 8 aid recipients rent housing,[25] arson of any Section 8 housing is within the scope of § 844(i). Of course, the fact that § 844(i) reaches all Section 8 housing does not mean that § 844(f) necessarily does the same. But the expansive breadth of § 844(i) deflates any argument that Congress, in § 844(f), was eager to avoid federalizing the crime of arson. Put another way, the expansive scope of § 844(i) blunts defendant's otherwise appealing argument that one must presume Congress did not intend radical expansion of federal jurisdiction over arson under § 844(f). Congress must have realized that the statute it enacted federalized arson to a dramatic extent. *But see supra* note 20.

**B.**

▆ Next, defendant argues that the rule of lenity compels a narrower interpretation of § 844(f) than that advocated by the government. The rule of lenity provides that where a criminal statute is ambiguous, doubts should be resolved in favor of lenity. *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). The legislature must speak in "clear and definite" language before courts will select the harsher of two interpretations of a statute. *Id.* Yet, the rule of lenity does not apply unless the statute is ambiguous. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *United States v. Lund,* 853 F.2d 242, 245 (4th Cir.1988). The statute in question here, § 844(f), does not contain sufficient ambiguity to warrant the application of the rule. Given the Supreme Court's discussion of the plain and ordinary meaning of "used" in *Smith,* it is clear that VHDA "used" Williams' townhouse because it employed the property in carrying out its Section 8 program and in ensuring Williams enjoyed appropriate housing.

Even assuming an ambiguity worthy of the rule, there is a further compelling reason that militates against the rule's application in this case. The rule exists in part to protect "an innocent citizen 'surprised by being prosecuted for acts that [he] did not know were criminal.'" *United States v. Contreras,* 950 F.2d 232, 244 (5th Cir.1991) (quoting *United States v. Singleton,* 946 F.2d 23, 24 (5th Cir.1991)), *cert. denied,* —— U.S. ——, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992). Even if § 844(f) is ambiguous, it should have been obvious to Davis that his conduct was criminal under some law, whether state or federal. Therefore, the principal reason for the rule is

**24.** *Russell* involved a two-unit apartment building, but subsequent cases have interpreted it as establishing "a per se rule that the rental of any property, even a single apartment unit, satisfies the interstate activity requirement of § 844(i)." *United States v. Doby,* 684 F.Supp. 558, 560 (N.D.Ind.1988) (finding § 844(i) applies to burning of two-story house where owner resided in first floor unit, had rented vacant second floor unit in the past, and was attempting to rent it again), *aff'd* 872 F.2d 779 (7th Cir.1989); *see United States v. Turner,* 995 F.2d 1357 (6th Cir.

1993) (affirming § 844(i) conviction for burning single-family rented home), *cert. denied,* —— U.S. ——, 114 S.Ct. 282, 126 L.Ed.2d 232 (1993); *cf. United States v. Vinnie,* 683 F.Supp. 285 (D.Mass. 1988) (finding § 844(i) inapplicable to single-family home used only as a residence and not rented).

**25.** Section 8 contemplates that housing assistance payments will be made toward the rent of leased properties. *See* 42 U.S.C. § 1437f(c).

absent here.[26]

## C.

Defendant also questions the constitutionality of § 844(f) as applied here, invoking the canon that statutes should be construed, where possible, to avoid serious constitutional questions. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988); *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928). Defendant's objection is not the more familiar type of claim that his conviction is unconstitutional because it violates his individual rights, such as to due process or against double jeopardy. He instead argues that his conviction is unconstitutional because Congress strayed outside the

limited authority provided to it in the Constitution when it enacted § 844(f).

▪ The most extensive discussion of the constitutionality of § 844(f) is found in *Brown v. United States,* 384 F.Supp. 1151, 1155–60 (E.D.Mich.1974), *rev'd on other grounds,* 557 F.2d 541, 559 (6th Cir.1977).[27] The *Brown* court considered three potential sources of congressional authority for § 844(f). After concluding that neither the Property Clause[28] nor the Commerce Clause[29] can support the legislation, the *Brown* court turned to the Necessary and Proper Clause.[30] Surveying the precedents, it found that the Necessary and Proper Clause grants Congress the authority to protect instrumentalities of the federal government, that is, "agencies which the federal government uses in lieu of its own agency or facility to carry out a federal program." *Id.* at 1159.[31] VHDA is surely an instrumentali-

---

**26.** Though this is the principal reason for the rule, its purposes go beyond protecting those with reason to believe their behavior is innocent. First, the rule ensures that fair warning is given not only as to what behavior is criminal, but also what sanctions will apply. *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958); *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). Second, the rule exists because, due to the moral gravity of imposing criminal penalties, "legislatures and not courts should define criminal activity." *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). For these reasons, the Supreme Court has unhesitatingly applied the rule of lenity and narrowly construed federal criminal statutes even in cases where the defendant's conduct was "readily denounced as criminal by the States." *Id.* at 349, 92 S.Ct. at 523.

**27.** *See also United States v. Kimberlin,* 805 F.2d 210, 242 (7th Cir.1986) (endorsing *Brown's* "very thoughtful" analysis), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

**28.** The Property Clause provides, in pertinent part, that "Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Section 844(f)'s legislative history expressly provides that it relies for its constitutional base on this clause. H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. at 4046. But the *Brown* court noted that the Property Clause cannot be properly invoked as the jurisdictional basis for legislation unless "some actual and substantial property interest of the federal government" is involved. 384 F.Supp. at 1157

(citing *United States v. Walter,* 263 U.S. 15, 44 S.Ct. 10, 68 L.Ed. 137 (1923)). Here, as in *Brown,* the Property Clause cannot support Congress's enactment of the statute, since the federal government "has no property interest in [VHDA], nor in any of [its] property." 384 F.Supp. at 1157.

**29.** *See* U.S. Const. art. I, § 8, cl. 3. The *Brown* court found that Congress had never made the requisite findings as to how the proscribed activity burdens interstate commerce. 384 F.Supp. at 1158 n. 6 (citing *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)).

**30.** The Necessary and Proper Clause grants Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

**31.** The *Brown* court reached its conclusion that the Necessary and Proper Clause allows Congress to protect federal instrumentalities, as in § 844(f), by an analysis of cases in which the Supreme Court approved immunity from state taxation for various agencies carrying out federal programs. *See Department of Employment v. United States,* 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966) (Red Cross); *Standard Oil of California v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942) (Army post exchanges); *Pittman v. Home Owners' Corp.,* 308 U.S. 21, 60 S.Ct. 15, 84 L.Ed. 11 (1939) (Home Owners' Loan Corporation); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) (Bank of the United States).

 

ty of the federal government, for it is one of many public housing agencies through which the United States implements its Section 8 program. *See* 42 U.S.C. § 1437f. As was noted in *Brown*, "Congress must have the means to protect those institutions it is currently funding to carry out federal programs if those programs are to be economically or expeditiously carried out." 384 F.Supp. at 1160. Thus, Congress had the power to proscribe bombing and burning of property used by the public housing agencies administering the Section 8 program, and so § 844(f), as applied to Davis, is constitutional.

### D.

Finally, defendant argues that the cases cited as controlling by the government are not on point. It is true that prior cases have not addressed the question presented here. *See United States v. Kimberlin*, 805 F.2d 210 (7th Cir.1986), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *Brown v. United States*, 384 F.Supp. 1151 (E.D.Mich.1974), *rev'd on other grounds*, 557 F.2d 541 (6th Cir.1977).[32] So while the government's argument in this case has never been accepted by another court, neither has it been rejected. The question raised here is simply a novel one. Furthermore, it is worth noting that the *Kimberlin* court stated it "had no doubt that Congress intended broad construction of the terms used [in § 844(f)], within constitutional limits." 805 F.2d at 242.

In sum, defendant's counterarguments do not upset the conclusion compelled by the statute's language and evident purpose. Because the townhouse where the arson occurred was used by VHDA, a federally-funded organization or institution, federal jurisdiction under 18 U.S.C. § 844(f) is present here. Davis's convictions based on the statute were valid ones, and his renewed motion

for judgment of acquittal pursuant to Rule 29(c), Fed.R.Crim.P., is denied as to all four counts on which he was convicted.

---

**32.** In *Kimberlin*, the defendant was convicted under § 844(f) for bombing property of the School Town of Speedway. The sole question argued and decided was whether School Town received federal financial assistance. *See* 805 F.2d at 242–43. The same question was in issue in *Brown*, that is, whether the Planned Parenthood Clinic bombed was an institution receiving federal financial assistance. 384 F.Supp. at 1153–55. In the instant case, it is beyond ques-

tion that VHDA receives federal assistance. The question that is in dispute here, whether VHDA "used" the property bombed, is not answered by the prior cases. Neither *Kimberlin* nor *Brown* considered whether the federally-funded organizations "used" the property bombed, since School Town and the Planned Parenthood Clinic owned, possessed, and physically occupied the properties where the bombings took place.