**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cecil McDonald DAVIS, Defendant–**
**Appellant.**

No. 95–5189.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 1, 1996.

Decided Oct. 11, 1996.

**ARGUED:** Howard Donald Criswell, III, Arlington, VA, for Defendant–Appellant. Michael Edward Rich, Assistant United States Attorney, Office of the United States

Attorney, Alexandria, VA, for Plaintiff–Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Office of the United States Attorney, Alexandria, VA, for Plaintiff–Appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and DOUMAR, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge WIDENER wrote the majority opinion, in which Judge MURNAGHAN joined. Senior Judge DOUMAR wrote an opinion concurring in the result.

## OPINION

WIDENER, Circuit Judge:

The defendant, Cecil McDonald Davis, was indicted in September 1994 under a four count indictment. The indictment alleged conspiracy, in violation of 18 U.S.C. § 371, to damage and destroy or attempt to damage and destroy by means of fire and explosive a building used by an organization receiving federal financial assistance, in violation of 18 U.S.C. § 844(f); to attempt to damage or destroy such a building and to damage or destroy such a building, a violation of 18 U.S.C. §§ 2 and 844(f); and to use a destructive device during a crime of violence, in violation of 18 U.S.C. § 924(c). A jury convicted Davis on all four counts. The court sentenced Davis to 120 months in prison for the § 371 and § 844(f) convictions and 360 months for the § 924(c) conviction, the 120-month sentences to run concurrently. Davis now appeals. The district court's post-trial opinion is published in 872 F.Supp. 1475 (E.D.Va.1995). We affirm.

### I.

On December 5, 1993 Tiffini Fairfax sold crack cocaine to Brenda Williams at Miss Fairfax's house in Leesburg, Virginia. The Leesburg police raided that house the next day. The Department of Social Services took Miss Fairfax's children from her because of neglect. Miss Fairfax believed that Miss Williams was cooperating with the police and that is why her house was raided and her children were taken from her.

Sometime between December 6 and 11, 1993, Cecil Davis, Tiffini Fairfax, Walter Langston, and others decided to set fire to Brenda Williams' house. Davis came up with the idea to pour some gasoline on Miss Williams' back porch, set the gasoline on fire, and leave a gas can filled with gasoline on the porch to go off like a bomb. On December 11, Langston attempted to do just that, but he was interrupted by Miss Williams who saw him through a window as he was pouring gasoline onto the porch. Langston left but told the others that he had set the fire. Davis went to Miss Williams' house to check on the fire and discovered that Langston had not set the fire as he had said he did. Nevertheless, Davis either told Miss Fairfax to give Langston a $50 rock of crack cocaine as payment or gave Langston the drugs himself.[1]

On December 12, the group decided to make a second attempt on Miss Williams' house. Langston came up with the idea of using a Molotov cocktail—he poured gasoline into a bottle and ripped a bed sheet to use as the wick. After lighting the wick, Langston threw the bottle on the back porch and the bottle exploded. A piece of carpet on the porch caught on fire, the outside wall of the house burned, and the sliding glass door shattered. Three people were in the house at the time, but nobody was injured. This time, Davis gave Langston cocaine powder as payment.

A grand jury indicted Davis on four counts stemming from the arson.[2] Federal criminal jurisdiction is based on 18 U.S.C. § 844(f), which makes it a federal crime to:

---

1. The record contains conflicting testimony on this fact. Langston and William Gaskins testified that Davis told Miss Fairfax to give Langston the drugs, and Miss Fairfax testified that Davis gave Langston the drugs.

2. Tiffini Fairfax and Walter Langston entered into plea agreements with the government. Each pleaded guilty to one count of arson under 18 U.S.C. § 844(f) and testified against Davis at trial.

maliciously damage[ ] or destroy[ ], or attempt[ ] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assistance.

Davis made a motion for judgment of acquittal, see Fed.R.Crim.P. 29(a), at the close of the government's case, at the conclusion of the presentation of evidence by both sides, and again after the jury verdict of guilty on the ground that the government's evidence did not show subject matter jurisdiction. The district court denied Davis' motion each time. Davis argued that the government had not proved that any organization receiving federal financial assistance had used the house. In its opinion, the court concluded that the Virginia Housing Development Authority (VHDA), which received federal financial assistance, did use the house and that, therefore, federal subject matter jurisdiction existed.

## II.

█ Davis argues that the district court should have granted his motion for judgment of acquittal because the evidence did not establish federal jurisdiction under § 844(f). Davis alleges that there was insufficient evidence that Miss Williams' house was being used by an organization that received federal financial assistance. This court reviews a denial of a motion for judgment of acquittal under a sufficiency of the evidence standard, with the evidence viewed in the light most favorable to the government. *United States v. Brooks,* 957 F.2d 1138, 1147 (4th Cir.), *cert. denied,* 505 U.S. 1228, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). Questions of statutory interpretation are subject to *de novo* review. *United States v. Letterlough,* 63 F.3d 332, 334 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 406, 133 L.Ed.2d 324 (1995).

█ As a preliminary matter, Davis attempts to argue that the VHDA is not an organization that receives federal financial assistance. Pursuant to Section 8 of the United States Housing Act of 1937, the United States Department of Housing and Urban Development (HUD) provides public housing agencies, of which the VHDA is one, with money to make payments for low-income housing assistance. 42 U.S.C. § 1437f. A government witness, Darlene Johnson, testified that HUD provides funds to the VHDA. Miss Johnson, a senior housing counselor with the Office of Housing Services in Loudon County, testified that the VHDA administers the Section 8 program and the Office of Housing Services implements the program. The government also introduced documents at trial which showed that the VHDA is a public housing agency that participates in the Section 8 Housing Assistance Payments Program; the HUD Certificate of Family Participation between VHDA and Miss Williams; and the HUD Housing Assistance Payments Contract between VHDA and the landlord. We note that Davis neither introduced evidence at trial tending to show that the VHDA does not receive federal financial assistance nor discredited Miss Johnson's testimony. We are of opinion that there was sufficient evidence to decide that the VHDA is indeed an organization receiving federal financial assistance and move on to the language of § 844(f).

█ When examining statutory language, courts generally give words their common usage. *United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). If the language of the statute is clear and unambiguous, courts simply apply the statute rather than interpret the statute. *Murphy,* 35 F.3d at 145. The word at issue in this case is "used." If the VHDA used Miss Williams' house, then federal jurisdiction exists under § 844(f). If the VHDA did not use Miss Williams' house, then federal jurisdiction does not exist. An accepted definition of the word "used" which we adopt here is found in *Webster's Third New International Dictionary* 2524 (1971), as follows: "1: employed in accomplishing something. . . ." See *Smith v. United States,* 508 U.S. 223, 228–29, 113 S.Ct. 2050, 2053–54, 124 L.Ed.2d 138 (1993) (relying on *Webster's* for the definition of "use" in the context of 18 U.S.C. § 924(c)(1)). Because the language of the

statute is clear, we need not look to the legislative history. *First United Methodist Church v. United States Gypsum Co.*, 882 F.2d 862, 865 (4th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).

Congress developed the Section 8 program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). The VHDA has as a statutory purpose "... providing sanitary and safe residential housing at prices or rentals which persons and families of low income can afford...." Va.Code of 1950 § 36–55.25(vi) (Supp.1996). The evidence is that HUD had certified Miss Williams to receive subsidized housing and that at the time of the incident she was receiving assistance from the VHDA to pay the rent on her townhouse. Miss Williams paid $31 a month for rent, and the VHDA paid the remaining $594 of the $625 monthly rent. When the VHDA helped Miss Williams with her rent payments, it was accomplishing its statutory function. We are of opinion that there was sufficient evidence for the jury to determine that the VHDA used Miss Williams' house. Thus, federal jurisdiction exists under § 844(f).

We also reject the argument that § 844(f) is constitutionally invalid because the government had no property interest in Miss Williams' property although it was used by an organization receiving federal funds.

### III.

■ Davis' next argument is that the district court erred in denying him a downward departure. The court did not depart from the sentencing guidelines because it did not believe it had a valid legal basis for doing so, therefore, Davis may appeal, which he could not do from a discretionary refusal to depart. *United States v. Hall*, 977 F.2d 861, 863 (4th Cir.1992). In this appeal, Davis argues that a sentence of less than the 30 years, plus the ten years' concurrent sentences, he received would provide just punishment and argues the sentence is excessive when compared to the sentences of his co-conspirators as an unwarranted sentence disparity among defendants. Davis also alleges that an unusual circumstance in this case was the prosecutor's charge of a 30–year minimum mandatory sentence crime to get him to accept a plea bargain.

■ The district court sentenced Davis to the minimum amount required by the guidelines and commented that the sentence was extremely severe; however, Davis' claim to this court that less than 30 years would be sufficient is misplaced. The commentary to the sentencing guidelines states: "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." United States Sentencing Commission, *Guidelines Manual* § 5K2.0 cmt (App. C, amend. 508, Nov. 1, 1994).

■■ Davis also claims that "excessive prosecutorial sentencing power" created an unusual circumstance that warrants departure in this case. In *United States v. Williams*, 47 F.3d 658 (4th Cir.1995), we stated: "[a] criminal justice system that tolerates and encourages plea negotiations must allow prosecutors to impose difficult choices on defendants even though the risk of more severe punishment may discourage a defendant from asserting his trial rights." *Williams*, 47 F.3d at 661 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978)). Disparity of sentences among co-conspirators is not a valid basis for departure. *Hall*, 977 F.2d at 864; *United States v. Ellis*, 975 F.2d 1061, 1066 (4th Cir.1992), *cert. denied*, 507 U.S. 945, 113 S.Ct. 1352, 122 L.Ed.2d 733 (1993). In *Ellis*, the district court departed downward when sentencing one of five conspirators because prosecutorial charging decisions resulted in disparate sentences for the five co-conspirators, with the most culpable members of the conspiracy receiving lenient sentences based on plea agreements. On appeal, we vacated the sentence and stated: "absent proof of actual prosecutorial misconduct, ... a district court may not depart downward based upon the disparity of sentences among codefendants." *Ellis*, 975 F.2d at 1066. Davis does not allege prosecutorial

misconduct in this case. Although the district court may not agree with the sentence it imposed, the court correctly determined that it did not have a legal basis upon which to depart.

## IV.

■ Davis' final argument is a challenge to the sufficiency of the evidence. As the reviewing court, we must construe the evidence in the light most favorable to the government and sustain the jury's verdict if there is substantial evidence to support the verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942). We are of opinion that there is substantial evidence to support the jury's verdict in this case.

Tiffini Fairfax testified that Davis became the leader of the group and that nobody questioned what he told them to do. Miss Fairfax testified that it was Davis' idea for the group to be at a dance club so they would have an alibi and not be linked to the fire. Walter Langston testified that Davis came up with the idea to set fire to Miss Williams' porch. Langston also testified that Davis went to a store with him and gave him $20 to pay for a hat, so he would not be noticed at Miss Williams' house, and gloves, so he would not leave fingerprints on the gas can.

After Langston first attempted to set Miss Williams' house on fire, Davis checked to make sure Langston actually started the fire, and when Davis discovered that Langston had not set the fire, Davis said he would have done it himself if he had known that it would not be done correctly. Although Langston had not set the fire, Davis paid him for his efforts. Davis also paid for the gasoline used in the second attempt on Miss Williams' house. Davis told Langston to throw the Molotov cocktail through either a back window or the sliding glass door if there was no back window. Davis watched Langston this time and again paid him for his efforts.

We are of opinion that the record contains substantial evidence that Davis planned the arson, furnished materials for the arson, supervised the arson, and paid the arsonist. Thus, the evidence supports the verdict.

The judgment of conviction and sentence is accordingly

*AFFIRMED.*

DOUMAR, Senior District Judge, concurring:

I concur in the Court's result. I write separately, however, to express my unease with the assertion of federal jurisdiction in this case.

In this case, the defendant participated in the firebombing of a townhouse in which the intended victim resided. The intended victim did not own the townhouse; instead, she personally leased her residence from a private entity. Because of her low income, a county-level housing agency, the Loudoun County Office of Housing Services, determined that she was eligible for and in fact provided her with a partial rent subsidy. This county agency implemented the assistance program pursuant to funding provided by and through a state agency, the Virginia Housing Development Authority, which executed a separate agreement with the landlord obligating the agency to pay part of her rent. The Virginia Housing Development Authority, in turn, obtains funding for this particular program from the United States Department of Housing and Urban Development pursuant to Section 8 of the United States Housing Act of 1937. *See* 42 U.S.C. § 1437f. Section 8 was enacted "[f]or the purpose of aiding lower-income families in obtaining a decent place to live...." *Id.* This lengthy chain, it is said, supports the assertion of federal jurisdiction to punish the defendant in this case based on the townhouse being "used by" a "United States ... agency" or an "organization receiving Federal financial assistance." *See* 18 U.S.C. § 844.

In any difficult case,

[w]e start with first principles: The Constitution creates a Federal Government of enumerated powers. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." This constitutionally mandated division of au-

thority "was adopted by the Framers to ensure protection of our fundamental liberties."

*United States v. Lopez,* — U.S. —, —, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (citations omitted).

Of course, the Supreme Court in *Lopez* identified only the constitutional limitations on Congress to use the Commerce Clause to criminalize conduct traditionally regulated by the States; thus, perhaps *Lopez* directly supports nothing in the case before this Court. Nevertheless, "[t]he Supreme Court's recent decision in *United States v. Lopez* marks a revolutionary and long overdue revival of the doctrine that the federal government is one of limited and enumerated powers." Steven G. Calabresi, *"A Government of Limited and Enumerated Powers": In Defense of United States v. Lopez,* 94 Mich.L.Rev. 752 (1995).

Whether the defendant in this case violated 18 U.S.C. § 844(f) and whether that statute is constitutional as applied are very close questions. I concur in the Court's affirmative answers because the organization subsidizing a portion of the intended victim's rent does receive federal assistance and because one could say that the organization was "using" the townhouse. I must comment, however, that once we accept the reasoning necessary to permit this perhaps tolerable extension of federal jurisdiction, little is left to stop the intolerable. What local or state agency does not receive some form of federal assistance? The question is rhetorical because we know that federal money eventually filters down to nearly every public entity and organization, from the suburban elementary school to the rural county sheriff's office to the urban family-planning clinic. Once that is understood, we realize that the transition from the federalist "what few things the federal government may do" to the centralist "what few things the federal government may not do" is now complete.

I caution against blind acceptance of incessant federal invasion into spheres which should be occupied by the States. Perhaps soon the Supreme Court will continue the process begun in *Lopez,* and reinvigorate our system of federalism sufficiently so that the extension of federal jurisdiction permitted by

this Court today will be acceptable no longer. I urge the Supreme Court to do so. Based on law existing today, however, I reluctantly concur.