**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 97-4641

SAMUEL WESLEY, JR., a/k/a Rick,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CR-97-33-CCB)

Submitted: August 18, 1998

Decided: October 28, 1998

Before ERVIN and MOTZ, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Howard L. Cardin, CARDIN & GITOMER, Baltimore, Maryland;
Flynn M. Owens, LAW OFFICES OF JACK B. RUBIN, P.A., Balti-
more, Maryland, for Appellant. Lynne A. Battaglia, United States
Attorney, John F. Purcell, Jr., Assistant United States Attorney, Balti-
more, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Samuel Wesley, Jr. appeals his jury convictions for conspiracy to distribute and possess with intent to distribute cocaine,[1] possession with intent to distribute cocaine,[2] aiding and abetting the use of a fire-arm during a drug trafficking crime,[3] and possession of a firearm by a convicted felon.[4] Wesley contends that the district court abused its discretion by admitting portions of a co-conspirator's written corre-spondence to another co-conspirator because the statements contained therein were not made in furtherance of the conspiracy. Wesley also alleges that the district court improperly denied his motion for acquit-tal on the use of a firearm charge. Finding no reversible error, we affirm Wesley's convictions.

On May 30, 1996, Wesley and co-conspirator Kristen Klaput arrived at Baltimore-Washington International Airport ("BWI") on a return trip from Los Angeles, California. Drug Enforcement Adminis-tration ("DEA") agents had been conducting surveillance at the airport for Wesley and Klaput on the information that Klaput, a suspected drug courier, would be arriving at BWI from Los Angeles on that date. When Klaput arrived at the airport, DEA agents approached and briefly questioned her; she confessed to carrying a kilogram of cocaine in her suitcase.[5] Upon her arrest, Klaput immediately cooper-ated with the authorities and identified Wesley as the person for

_____

**1** <u>See</u> 21 U.S.C. § 846 (1994).
**2** <u>See</u> 21 U.S.C. § 841(a) (1994).
**3** <u>See</u> 18 U.S.C. § 2 (1994); 18 U.S.C.A. § 924(c)(1) (West Supp. 1998).
**4** <u>See</u> 18 U.S.C.A. § 922(g) (West Supp. 1998).
**5** While in Los Angeles, Wesley taped the kilogram of cocaine to Klaput's body. Later, in an airport restroom, she placed the cocaine in her suitcase.

2

whom she was carrying the cocaine. Wesley, arriving at BWI on the same flight from Los Angeles, was also arrested at the airport. Both Wesley and Klaput were then charged in Maryland state court with conspiracy to distribute cocaine and related offenses. Three days before Klaput was scheduled to testify against Wesley, she was shot in the head, neck, and right leg when she answered the door to her apartment. With evidence of Wesley's involvement in the shooting, his criminal case was referred for federal prosecution. The grand jury issued an indictment, and Wesley was arrested at the clothing store he operated. Pursuant to this arrest, officers seized from the store a 9mm semi-automatic pistol, an electronic scale with cocaine residue, and a box of plastic baggies typically used to package cocaine for distribution.

At Wesley's federal trial, Klaput testified that in April 1995, her boyfriend, Richard Maurice Holmes, recruited her to illegally transport cocaine for Wesley from Los Angeles to Baltimore.[6] Wesley paid Klaput $1000 for each trip in addition to paying for her airfare and lodging. Klaput traveled to Los Angeles as Wesley's courier every two to three weeks, always transporting at least one kilogram of cocaine on each occasion. Wesley always accompanied her to purchase and secure the cocaine for the return trip to Baltimore. Klaput also testified that Wesley threatened that if she were ever arrested and chose to cooperate with the authorities, both she and her infant child would be killed.

The Government also presented witnesses who testified that on the day that Klaput was shot, Wesley was with two other individuals who asked in which apartment "that white girl" lived, even offering one witness $200 to knock on Klaput's door. The witness refused. Another witness overheard these individuals say they were going to have to go to court for drugs and that they would have to get that "white girl."[7] Still another witness identified Wesley as the man seen entering Klaput's apartment building moments before the shooting

_____

[6] Klaput had acted as a courier for Holmes and his associate, William Watts, bringing drugs from New York to Baltimore since the summer of 1994.

[7] Klaput was the only Caucasian female residing in that apartment building.

3

and later seen running from the vicinity of Klaput's apartment to the rear of the building after the shooting.

Holmes corroborated Klaput's testimony that he recruited her first as a courier for his and William Watts' drug trafficking activities and later to work in that same capacity for Wesley shortly after Watts introduced Wesley and Holmes in April or May 1995. Holmes assisted Klaput in her capacity as Wesley's drug courier: he advised her, coordinated her contacts with Wesley, and provided her transportation to and from the airport. For his assistance, Wesley allowed Holmes to purchase a portion of the cocaine that he and Klaput brought back from Los Angeles at a wholesale price.

In September 1995, Holmes was arrested and incarcerated on a parole violation. Despite his incarceration, Holmes maintained written correspondence with Klaput. Over defense objection, the district court allowed the Government to introduce portions of two of these letters into evidence. The court ruled that the selected portions of these letters were admissible under Fed. R. Evid. 801(d)(2)(E) because there was proof that Wesley, Klaput, and Holmes were engaged in a drug trafficking conspiracy and that the letters were written during and in furtherance of that conspiracy. The admitted portion of the first letter, dated October 1, 1995, read:

> I need you to contact Rick and see when he will need you to go to L.A., if it is soon then fine, if not see if he will loan you the money for the lawyer to represent me at my revocation hearing.

In the second letter, dated October 22, 1995, Holmes wrote:

> So let Rick and T know that you are getting ready to retire unless they want you to train or recruit someone for them. They will use you until you are caught. If you get caught now it is no loss to them because you have gotten by so many times.

Wesley concedes that until Holmes's incarceration in September 1995, Holmes and Klaput had both been involved in his drug traffick-

4

ing activities. However, on appeal, Wesley contends that Holmes was no longer a member of the conspiracy because he was incarcerated when he wrote the letters. As a result, the statements contained in those letters could not have been written in furtherance of the conspiracy. We disagree.

To admit a co-conspirator's statement under Fed. R. Evid. 801(d)(2)(E), the court must conclude that a conspiracy existed, that the declarant and the party against whom the testimony is sought to be admitted were both engaged in the conspiracy, and that the statements at issue were made in the course of and in furtherance of the conspiracy.[8] The Government must prove each element by a preponderance of the evidence,[9] and a district court's decision to admit such testimony is reviewed for abuse of discretion.[10]

We find that the disputed portions of the correspondence between Holmes and Klaput were properly admitted. The trial evidence established a conspiracy between Wesley, Holmes, and Klaput to illegally transport and distribute cocaine. Further, the statements in both letters were made in the course of and in furtherance of that conspiracy. In the first letter, Holmes encouraged Klaput to contact Wesley to ascertain if she were needed to make a trip to Los Angeles. He needed money for an attorney, money that Klaput could obtain either by working as Wesley's courier or by personally borrowing from Wesley on Holmes's behalf. Either alternative fully implicates the objectives of their conspiracy.

The second letter spoke exclusively of Klaput's future involvement in the conspiracy. Holmes advised Klaput that she should inform Wesley of her intentions to retire from the conspiracy, admonishing her that she might still be required to train or recruit her replacement. He also warned her of the consequences if she were caught. The fact that Holmes was incarcerated when he wrote these letters does not mean that he had withdrawn from the conspiracy. [11] There is no evi-

_____

[8] **See United States v. Neal**, 78 F.3d 901, 905 (4th Cir.), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3260 (U.S. Oct. 7, 1996) (No. 95-9410).
[9] **See Bourjaily v. United States** , 483 U.S. 171, 175 (1987).
[10] **See United States v. Blevins** , 960 F.2d 1252, 1255 (4th Cir. 1992).
[11] **United States v. West**, 877 F.2d 281, 289 (4th Cir. 1989) (holding co-conspirator's "membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action.").

5

dence that Holmes "acted to defeat or disavow the purposes of the conspiracy."**12** In fact, in the first letter, he expressly sought to reap the benefits of the conspiracy's illegal activities. Therefore, we find that both statements clearly fall within the hearsay exception; therefore, the district court's findings were not clear error. Nor did the court abuse its discretion in admitting this evidence.

Next, Wesley contends that the court erred in denying his motion for a judgment of acquittal in relation to the offense of using a firearm during and in relation to a drug trafficking offense.**13** He alleges that there was insufficient evidence to find that the firearm involved in Klaput's shooting was used "during and in relation to" any drug trafficking crime because Klaput was shot more than five months after their arrest at BWI and because there was no evidence that Wesley continued to engage in drug trafficking after his arrest in May 1996.

We must sustain a jury verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it."**14** This same sufficiency of the evidence standard of review applies in our review of a denial of a motion for acquittal.**15** To prove a violation of 18 U.S.C.A. § 924(c)(1), the Government must show that: (1) the defendant used or carried a firearm, and (2) the defendant did so during and in relation to a drug trafficking offense or crime of violence.

We find sufficient evidence supports Wesley's § 924(c)(1) conviction. The Government's evidence established that Wesley shot Klaput three days before she was scheduled to testify against him in state court. The actual firing of a firearm clearly satisfies the "active employment" requirement for use of a firearm as outlined in Bailey.**16** While the phrase "during and in relation to" is expansive, the firearm must at least have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of

---

**12** Id.

**13** See 18 U.S.C.A. § 924(c)(1).
**14** Glasser v. United States, 315 U.S. 60, 80 (1942).

**15** See United States v. Davis, 98 F.3d 141, 144 (4th Cir. 1996), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3630 (U.S. Mar. 17, 1997) (No. 96-7755).

**16** See Bailey v. United States, 516 U.S. 137, 148 (1995).

6

accident or coincidence. Instead, the gun must facilitate, or have the potential of facilitating, the drug trafficking offense.**17**

Here, the evidence establishes that Wesley threatened to kill Klaput and her child if she ever cooperated with the police. Despite this threat, when Klaput was arrested in May 1996, she immediately cooperated with the police, informing them that she worked for Wesley, giving explicit details concerning his drug trafficking business operations, and agreeing to testify against Wesley. In an effort to avoid prosecution on the state drug charges, Wesley shot Klaput in an attempt to silence her before she could testify against him. There was no evidence that Klaput's shooting was an accident or that it was merely a coincidence that it occurred three days before Wesley's trial. Further, there was no evidence that Wesley affirmatively withdrew from the conspiracy. His arrest in May 1996, does not establish withdrawal.**18** That the shooting occurred five months after their arrest is of little consequence. It is sufficient that the purpose of the shooting was grounded in Wesley's involvement with the drug trafficking conspiracy.**19**

Accordingly, we affirm Wesley's convictions. Further, while we grant Wesley's motion to file a pro se supplemental brief, we reject his claim challenging the Government's grant of immunity to its witnesses in exchange for their truthful testimony and his claim challenging the admission of Klaput's direct trial testimony as hearsay.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

_____

**17 See Smith**, 508 U.S. at 238.

**18 See West**, 877 F.2d at 289.

**19 See United States v. Wilson**, 135 F.3d 291, 304-05 (4th Cir. 1998) (finding evidence sufficient to support § 924(c)(1) conviction when defendants brandished firearms and pistol whipped victim who no longer wanted apartment to be used as safe haven for drug dealers), cert. denied, ___ U.S. ___, 66 U.S.L.W. 3758 (U.S. May 26, 1998) (No. 97-8750).