COMMONWEALTH OF VIRGINIA,
Plaintiff

v.

Janet RENO, Attorney General of the United States, and the District of Columbia, Defendants.

C.A. No. 96–826–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 11, 1997.

James S. Gilmore, III, Attorney General of Virginia, David E. Anderson, Chief Deputy Attorney General, Catherine C. Hammond, Deputy Attorney General, Gregory E. Lucyk, Senior Assistant Attorney General, A. Ann Berkebile, Pamela A. Sargent, Assistant Attorneys General, and Peter R. Messitt, Senior Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Plaintiff.

Helen F. Fahey, United States Attorney, Dennis E. Szybala, Assistant United States Attorney, Alexandria, Virginia, Vincent M. Garvey, Joseph W. Lobue, Department of Justice, Charles F.C. Ruff, Corporation, Counsel, D.C., Michael E. Zielinski, Deputy Corporation Counsel, D.C., William J. Earl, Asst. Deputy Corporation Counsel, D.C., Special Litigation Division, Louise Phillips, and Justin Draycott, Assistant Corporation Counsel, D.C., Washington, D.C., for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this action, the Commonwealth of Virginia seeks to close the District of Columbia's Lorton Correctional Complex ("Lorton"). Because Lorton lies outside the District of

Columbia ("District") and wholly within Virginia's boundaries, the Commonwealth of Virginia argues that the District's operation of Lorton exceeds the power granted the federal government under the Enclave Clause, U.S. Const., Art. I, § 8, cl. 17. The federal government and the District respond by asserting that it is the Property Clause, U.S. Const., Art. IV, § 3, cl. 2, not the Enclave Clause, that governs here and authorizes both the acquisition of the property on which Lorton stands and the District's operation of Lorton. Thus, the parties' respective cross-motions for summary judgment and dismissal present the question whether the Enclave Clause limits Congress' power under the Property Clause to authorize the District's operation of a municipal prison beyond the ten mile square area set aside for the seat of federal government.

## I[1]

In the first decade of this century, the District began to explore possible sites in Virginia and Maryland for the construction and operation of a reformatory and workhouse for municipal prisoners. In 1909, Congress expressly authorized the District's Commissioners to acquire two tracts of land in either Maryland or Virginia to "be used as a site for the construction and erection of a reformatory ... and a workhouse...." Act of March 3, 1909, 35 Stat. 688, 717, ch. 250.

1. This action is before the Court on defendants' motions to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., and plaintiff's motion for summary judgment under Rule 56, Fed.R.Civ.P. There are no factual disputes material to the disposition of these motions.

2. According to Wickersham:
 In case such purchase should be made by the Commissioners of the District, they would be without exclusive jurisdiction over the land, as the cession of jurisdiction and authority to purchase, granted to the United States by the States of Maryland and Virginia, respectively, do not apply to the Commissioners of the District. Indeed, it may be seriously questioned whether, without special legislation in the State of Maryland or Virginia, the Commissioners of the District could lawfully hold prisoners on the lands so purchased within either of those States.

3. For descriptions of the nine parcels, see Appendix VIII to the District of Columbia Position Paper on Senate Bill 1243, *Transfer of Lorton*

The manner in which title to the site should be acquired, however, was the subject of an inquiry by then-U.S. Attorney General George Wickersham. In a letter to President Theodore Roosevelt, Wickersham explained his legal conclusion that the federal government, not the District, should acquire title to the site to avoid any constitutional infirmity.[2] Accordingly, Congress amended the initial Act to provide that the United States would take title to the land. Act of August 5, 1909, 36 Stat. 118, 122, ch. 7.

And so it did. In a series of separate transactions occurring between March 1910 to December 1953, the United States acquired nine parcels of land in Fairfax County, Virginia by private sale or condemnation proceedings.[3] The nine contiguous parcels, which total approximately 3,000 acres, constitute present-day Lorton. The first parcel was acquired on March 19, 1910, when the United States purchased a parcel of land for Lorton's workhouse from private parties. Then, between April 10, 1913 and August 22, 1934, the United States acquired by purchase five more parcels of property for Lorton's reformatory. And finally, the federal government obtained Lorton's three remaining parcels during the period from August 3, 1944 to December 2, 1953. All nine parcels were acquired with congressionally appropriated funds and are titled in the name of the United States.[4]

*Reformatory to the District of Columbia, Hearings on S. 1243 Before the Subcomm. on National Penitentiaries of the Sen. Comm. on the Judiciary,* 94th Cong., 1st Sess. 92–95 (1975).

4. The United States has varying degrees of jurisdiction over Lorton's nine parcels. By a general consent statute enacted in 1902, Virginia ceded exclusive jurisdiction to the United States over all federally acquired properties, including Lorton's first parcel. *See* Acts of Assembly 1901–1902, ch. 484, pp. 565–66 as amended in Acts of Assembly 1912, ch. 260, p. 563; Acts of Assembly 1918, ch. 382, p. 568. By an amended consent statute, Virginia ceded concurrent jurisdiction over the five parcels acquired between 1913 and 1934. *See* Code of Virginia 1919, § 19; Code of Virginia 1950, § 7.1–13. And finally, Virginia retains general jurisdiction over the three remaining parcels because the United States failed to accept jurisdiction as required by federal statute. *See* 40 U.S.C. § 255. Accordingly, jurisdiction over crimes committed at Lorton is vested in the United States District Court for the Eastern

Although the federal government acquired and paid for the land on which Lorton stands, the federal Bureau of Prisons ("BOP") has never been involved in Lorton's operation, management, or regulation.[5] Instead, since Lorton's inception, Congress has vested authority for its operation in various administrative bodies of the District. In 1926, Congress created a Board of Public Welfare, which consisted of nine members appointed by the District's Commissioners, to supervise Lorton's superintendent and other prison employees. Act of March 16, 1926, 44 Stat. 209, ch. 58. Then, in 1946, Congress created the District's Department of Corrections and transferred the powers and duties of the Board of Public Welfare to the Director of the new Department. Act of June 27, 1946, 60 Stat. 320, ch. 507, §§ 1 and 3 (codified at D.C.Code Ann. §§ 24–441 and 24–443 (1981)). The statute provided that the Department of Corrections shall "have charge of the management and regulation" of Lorton, "be responsible for the safekeeping, care, protection, instruction, and discipline" of all persons committed there, and "have power to promulgate rules and regulations for [its] government." *Id.*, § 2 (codified at § 24–442 (1981)). In carrying out these responsibilities, the Department of Corrections has been, and continues to be, subject to the supervision and control of the District's governing body, which itself has changed form over time.[6]

Currently, Lorton houses three distinct classes of prisoners: (1) those sentenced by the District's Superior Courts for municipal offenses; (2) those sentenced by the U.S. District Court for the District of Columbia for local crimes; and (3) those sentenced by the U.S. District Court for the District of Columbia for federal infractions.[7] The U.S. Attorney General has authority to designate Lorton, as well as other suitable prison facilities, as the place of confinement for these three classes of prisoners. Act of June 6, 1940, 54 Stat. 244, ch. 254, § 8 (codified at D.C.Code § 24–425 (1981)).[8]

Lorton's operation does not, of course, require use of all of the approximately 3,000

---

District of Virginia pursuant to 18 U.S.C. § 13, which assimilates provisions of the Virginia Code to fill-in gaps under federal law. *See United States v. Young*, 916 F.2d 147, 149 (4th Cir.1990).

**5.** Worth noting, perhaps, is that in the early 1970s, Congress rejected the efforts of Virginia Senator William Scott to transfer operational control of Lorton from the District to the BOP. For a brief history of Senator Scott's repeated attempts to confer jurisdiction over Lorton to the Department of Justice, see *Cannon v. United States*, 645 F.2d 1128, 1135 n. 27 (D.C.Cir.1981); *Milhouse v. Levi*, 548 F.2d 357, 362 n. 13 (D.C.Cir.1976).

**6.** The Constitution does not designate a form of government for the District but instead expressly empowers Congress to do so. Over the years, Congress has changed the District's form of government on several occasions. Initially, Congress created a local government with substantial home rule powers, including a popularly-elected council and a mayor. 2 Stat. 195, ch. 53 (1802). This form continued until 1871, when Congress created a territorial government with a governor and a bicameral legislature consisting of Delegates and a council, whose members were appointed by the President. 16 Stat. 419, §§ 2 and 9, ch. 62 (1871). Three years later, in 1874, Congress replaced that system with a three member Commission. 18 Stat. 116, ch. 337 (1874). This Commission was, in turn, abolished by the Reorganization Plan No. 3 of 1967, which transferred the functions of the three member Board

of Commissioners to a newly constituted D.C. Council and Commissioner. Finally, in 1973, Congress enacted the District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule Act"), Pub.L. No. 93–198, 87 Stat. 774 (1973), which created the District's current form of government, consisting of a Council and a mayor.

**7.** The number of Lorton prisoners in this category has declined considerably as persons convicted in the U.S. District Court for the District of Columbia for violations of the U.S. Criminal Code are no longer sent to Lorton.

**8.** This provision provides, in pertinent part, as follows:

All prisoners convicted in the District of Columbia of any offense, including violations of municipal regulations and ordinances and acts of Congress in the nature of municipal regulations and ordinances, shall be committed, for the term of their imprisonment, ... to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons may be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia.

acres on which the facility stands. Other activities also occur on the property. In this regard, the federal government allows the District to assert a proprietary interest over the Lorton property by leasing portions of it to third parties and by using other portions of it for other non-penal purposes, both municipal and private.[9] Thus, the District has located a landfill on Lorton property to hold waste and debris collected from District residents across the Potomac River. Further, the District has leased portions of Lorton property to Vulcan Materials Company for a stone products processing plant. Finally, the District requires federal agencies seeking access to Lorton, such as the Federal Bureau of Investigation, the U.S. Army Corps of Engineers, and the Department of the Army, to enter into permit agreements for this purpose.

In recent years, severe budget deficits, escalating cash-flow shortages, and a dramatic increase in crime have plagued the District. As a result, the Lorton inmate population has grown significantly, while Lorton's facilities have not been significantly enlarged or modernized. Virginia correctly claims that Lorton has experienced numerous operational problems as a consequence of the District's well-documented decline. Specifically, Virginia points to a 1996 study, authorized by Congress and conducted by the National Council on Crime and Delinquency, that found Lorton's facilities to be "deplorable." The study noted that many of Lorton's basic structures needed repair or replacement, that most of its buildings had no sprinkler and/or fire alarm systems, and that the security staff was wholly unprepared

to control adequately the burgeoning inmate population. Accordingly, Virginia complains that escapes and other inmate disturbances threaten the safety and well-being of Virginia's citizens and burden the state's financial and administrative resources.[10]

This action, filed on June 13, 1996, contains three counts. Counts I and II both claim that the Enclave Clause, U.S. Const., Art. I, § 8, cl. 17, prohibits Congress from authorizing the operation of a prison facility in Virginia for the District's inmates. Specifically, Count I claims that the District's Code provisions conferring authority on the Department of Corrections for Lorton exceeds the ten mile territorial limit of the Enclave Clause, while Count II claims that the District's use and occupation of a municipal prison violates Virginia's sovereignty. Alternatively, Count III alleges that the U.S. Attorney General lacks any constitutional authority to designate Lorton as the place of confinement for the District's prisoners.

Defendants, Janet Reno and the District, filed separate motions to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., on August 16, 1996. On September 5, 1996, plaintiff, Virginia, objected to those two motions and then moved for summary judgment under Rule 56, Fed.R.Civ.P. The motions were argued orally and taken under advisement with the parties invited, but not required, to file additional briefs. *Commonwealth of Virginia v. Reno*, C.A. No. 96–826–A (Order, November 15, 1996). The parties did not avail themselves of this opportunity and the motions are now ripe for disposition.

**9.** The Department of Justice issued a memorandum explicitly recognizing the authority of the District to enter into such agreements and leases. *See Memorandum for James W. Moorman, Assistant Attorney General, Land and Natural Resources Division* (September 17, 1980).

**10.** Recent events at Lorton involving inmate escapes, official corruption, and drug smuggling furnish support for Virginia's criticisms. *See, e.g.*, Editorial, *More Questions About Lorton*, WASH. POST, Jan. 12, 1997, at C6 ("As the Wilkes escape shows, Lorton poses a current and major threat to public safety."); Colbert I. King, *Corrupt at Corrections*, WASH. POST, Oct. 26, 1996, at A23 ("More than 30 Lorton corrections officers have been convicted in the past three years of

everything from accepting bribes and smuggling drugs to selling guns to inmates."); Charles W, Hall, 16 Charged with Smuggling at Lorton; *Group is 2nd Accused of Posing as Religious Volunteers to Pass Drugs*, WASH. POST, Oct. 25, 1996, at D3 ("Lorton has been rife with illegal drug use in recent years."); Bill Miller, *Drug Use at Lorton Called "Public Scandal"; U.S. Judge Refuse to Send Inmate Back*, WASH. POST, Nov. 16, 1993, at A1 ("A federal judge in Alexandria has refused to send a prisoner convicted of possessing heroin inside the Lorton Correctional Complex back to the prison, declaring that 'the ease with which inmates can obtain drugs in Lorton is a public scandal.' ").

## II

 The Constitution explicitly refers to federal power over property in two, independent passages: the Enclave Clause, U.S. Const., Art. I, § 8, cl. 17,[11] and the Property Clause, U.S. Const., Art. IV, § 3, cl. 2.[12] The seldom-analyzed relationship between these two independent grants of federal property power is at the heart of this action. In brief, the Enclave Clause grants Congress exclusive legislative jurisdiction over all property, federal and private, within particular geographical areas, or enclaves. The Property Clause grants the federal government sweeping authority to dispose of and manage federally-owned land and other real property.

 The history and plain language of both provisions make pellucidly clear their distinct purposes and functions. By its express terms, the Enclave Clause accomplishes two important, related objectives: (i) it establishes the seat of the new federal government in less than ten square miles of land to be ceded by unnamed states;[13] and (ii) it provides Congress with exclusive legislative jurisdiction over this new district, as well as over other parcels of property, or "enclaves," acquired from the states for the construction of various military installations and other necessary federal facilities. As the annals of the Constitutional Convention reflect, delegates proposed and eventually adopted the Enclave Clause in the interest of safeguarding our nation's then-unique system of federalism. To this end, the Enclave Clause grants Congress the right of exclusive legislative power over federal enclaves as a prophylactic against undue state interference with the affairs of the federal government.[14] Yet, ever sensitive to the risk of granting the federal government unchecked power, the founders limited and balanced this federal grant of power by requiring state consent to the federal acquisition of state land for enclaves.[15] In other words, the Enclave Clause

11. This Clause grants Congress the power:

> To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.

12. The Property Clause provides that:

> The Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other property belonging to the United States; and nothing in this Constitution contained, shall be so construed as to prejudice any claims either of the United States or of any particular State.

13. In 1790, the District of Columbia was selected as the nation's new capitol. The next year, in 1791, Congress purchased the District's land from Virginia and Maryland property owners and those two states ceded exclusive jurisdiction to the U.S. government. Then, in 1846, Congress retroceded to Virginia the land it ceded for the creation of the capitol. See W. TINDALL, THE ORIGIN AND GOVERNMENT OF THE DISTRICT OF COLUMBIA (1903). For a case concerning the jurisdictional boundary between the District and Virginia, see *United States v. Herbert Bryant Inc.*, 543 F.2d 299 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977).

14. Under the Articles of Confederation, the safety and security of Congress' predecessor body were at the mercy of its host state. Joseph Story, in his Commentaries on the Constitution, described the seminal event that led to the adoption of the Enclave Clause:

> It is not improbable, that an occurrence, at the very close of the revolutionary war, had a great effect in introducing this provision into the constitution. At the period alluded to, the congress, then sitting at Philadelphia, was surrounded and insulted by a small, but insolent body of mutineers of the continental army. Congress applied to the executive authority of Pennsylvania for defence; but, under the ill-conceived constitution of the state at that time, the executive power was vested in a council consisting of thirteen members; and they possessed, or exhibited so little energy, and such apparent intimidation, that congress indignantly removed to New Jersey, whose inhabitants welcomed them with promises of defending them.

Joseph Story, Commentaries on the Constitution 3, § 1214 (1833).

15. As James Madison noted, many delegates expressed concern that Congress' exclusive legislation over federal enclaves would provide it with the means to "enslave any particular state by buying up its territory, and that the strongholds proposed would be a means of awing the State into an undue obedience to the [national] government." James Madison, 2 Debates in the Federal Convention, 513 (quoting Elbridge Gerry of Massachusetts). Ultimately, the delegates' apprehension about excessive federal power was allayed by requiring the national government to obtain the states' express consent to acquire and employ state property for federal purposes.

reflects a respect for the autonomy of federal and state governments by equipping Congress with the "sword" of legislative authority and supplying the states with the "shield" of consent.

As judicially construed, the Enclave Clause is both broader and narrower in some respects than its wording and history suggest. First, the catch-all phrase "other needful Buildings" in the Clause's list of places eligible for enclave status has been liberally interpreted to encompass more than just edifices. Thus, federal enclaves may contain structures such as dams,[16] lighthouses,[17] war memorials,[18] or even land designated as a National Park.[19] Second, the phrase "exclusive Legislation" has been read more narrowly than a grant of absolute sovereignty within federal enclaves.[20] Although the Enclave Clause refers to "exclusive" federal jurisdiction over enclaves, the states can condition their consent by reserving vestiges of jurisdiction over ceded areas and, as long as these reservations do not conflict with announced federal purposes, joint, or dual, jurisdictional arrangements are possible.[21] Put another way, the extent and scope of Congress' legislative jurisdiction under the Enclave Clause now depends upon the actual amount of authority ceded by the states.[22]

In the case of the District, where the United States does not share jurisdiction with any state, Congress' power is plenary.[23] In other words, when Congress legislates with respect to the District, it exercises the same general type of police and regulatory powers as does a state government acting within state territory.[24] Thus, while Congress has granted the District varying degrees of "autonomy" over the years, the Dis-

---

**16.** *James v. Dravo Contracting Co.,* 302 U.S. 134, 141–42, 58 S.Ct. 208, 212–13, 82 L.Ed. 155 (1937).

**17.** *Chappell v. United States,* 160 U.S. 499, 509–10, 16 S.Ct. 397, 400, 40 L.Ed. 510 (1896).

**18.** *United States v. Gettysburg Electric R.R. Co.,* 160 U.S. 668, 680–86, 16 S.Ct. 427, 429–31, 40 L.Ed. 576 (1896).

**19.** *Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 529, 58 S.Ct. 1009, 1014, 82 L.Ed. 1502 (1938).

**20.** If the federal courts had literally and strictly construed this exclusive jurisdictional requirement, a federal enclave would essentially be "a state within a state." But the Supreme Court did not read the phrase so literally. *See, e.g., Howard v. Commissioners of Sinking Fund of City of Louisville,* 344 U.S. 624, 626–28, 73 S.Ct. 465, 467, 97 L.Ed. 617 (1953) (upholding the city's annexation of a naval ordinance plant because "the fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal government"); *Evans v. Cornman,* 398 U.S. 419, 421–22, 90 S.Ct. 1752, 1754–55, 26 L.Ed.2d 370 (1970) (upholding the right of persons living on the grounds of the National Institutes of Health, a federal enclave, to vote in Maryland elections).

**21.** *See, e.g., Paul v. United States,* 371 U.S. 245, 264–65, 83 S.Ct. 426, 437–38, 9 L.Ed.2d 292 (1963); *Stewart & Co. v. Sadrakula,* 309 U.S. 94, 100, 60 S.Ct. 431, 434, 84 L.Ed. 596 (1940); *James,* 302 U.S. at 147–48, 58 S.Ct. at 215–16;

*Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 541, 5 S.Ct. 995, 1003–04, 29 L.Ed. 264 (1885).

**22.** When the United States has exclusive jurisdiction, all state and municipal laws in effect at the time of the territory's cession and not inconsistent with federal use of the enclave are assimilated as federal law within the enclave. State and local laws passed after the federal government has acquired exclusive control over the property have no application to the enclave unless adopted by Congress. *See, e.g., United States v. State Tax Comm. of Miss.,* 412 U.S. 363, 369–73, 93 S.Ct. 2183, 2187–90, 37 L.Ed.2d 1 (1973); *Pacific Coast Dairy, Inc. v. Department of Agriculture of Cal.,* 318 U.S. 285, 294, 63 S.Ct. 628, 630, 87 L.Ed. 761 (1943). But when the federal and state governments agree to some system of concurrent, or joint, jurisdiction, some state laws will remain effective within the federal enclave without the consent of the federal government. *See, e.g., Collins,* 304 U.S. at 532–33, 58 S.Ct. at 1016; *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 839 v. Morrison–Knudsen Co.,* 270 F.2d 530, 533–34 (9th Cir.1959).

**23.** *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 75, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982); *District of Columbia v. Carter,* 409 U.S. 418, 429, 93 S.Ct. 602, 608–09, 34 L.Ed.2d 613 (1973); *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973); *Paul,* 371 U.S. at 264, 83 S.Ct. at 437–38; *Berman v. Parker,* 348 U.S. 26, 31, 75 S.Ct. 98, 101–02, 99 L.Ed. 27 (1954).

**24.** *Palmore,* 411 U.S. at 397, 93 S.Ct. at 1676; *Paul,* 371 U.S. at 263, 83 S.Ct. at 437.

trict's operation remains under the ultimate discretion of Congress,[25] subject only to the constraints of the Bill of Rights and other constitutional protections.[26]

■ Significantly, nothing in the language, history, or judicial treatment of the Enclave Clause suggests that all of the District's functions must be accomplished within the ten square miles set aside for the seat of the national government. The Clause is simply not concerned with specifying where District functions may be carried out; it is, indeed, concerned solely with establishing Congress' exclusive legislative authority over the District and, hence, does not preclude the federal government from acquiring property outside the District for the District's purposes. In other words, the Enclave Clause does not prohibit the federal government from transferring the entire District government, or portions of it, to a federal agency located on federal property in Maryland, Virginia, or, indeed, elsewhere.[27] In fact, federal government buildings occupy so much of the District's meager territory that Congress has previously placed some District facilities outside the District's boundaries.[28] For instance, in the 1920s, Congress acquired property in Prince George's County, Maryland, and then authorized the District to construct and operate the now-closed Glenn Dale Hospital, a Children's Tuberculosis Sanatorium.[29]

■ Separate and distinct from the Enclave Clause, the Property Clause, on its face, permits the federal government to buy, sell, regulate, and manage all federally-owned real property, irrespective of state consent. The history and ratification of the Clause confirms this purpose: The debates at the Constitutional Convention clearly indicate that the Property Clause was intended to delineate the national government's role in the disposition of our nation's expansive, unsettled territories. Following the American Revolution, the seven states owning lands beyond their settled boundaries reluctantly relinquished their claims to certain western regions as part of a grand compromise that led to the ratification of the Articles of Confederation.[30] The federal govern-

25. Although Congress granted the District "home rule" and a certain degree of municipal autonomy in the 1970s, Congress nevertheless retains sweeping constitutional and legal authority over the District's operations. Specifically, the legislative power delegated to the District is subject to Congress' "right, at any time, to exercise its constitutional authority as legislature for the District on any subject ... including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council." Home Rule Act, Pub.L. No. 93–198, § 601, 87 Stat. 774 (1973) (codified at D.C.Code § 1–206 (1981)). In fact, the future of home rule has been the topic of considerable and widespread speculation in recent months. See, e.g., David A. Vise and Clay Chandler, Clinton Proposes U.S. May Run D.C. Services, WASH. POST, Jan. 14, 1997, at A1, A8 ("Under the far-reaching proposal, self-government in the District would retreat in important ways, with some federal agencies playing a larger role in D.C. affairs."); John Mercurio, Control Board Seeks Big Changes, Bucks in Plan for District, WASH. POST, Dec. 13, 1996, at A15 ("D.C. financial control board members yesterday said they can achieve their plan for massive new federal assistance for the ailing city without stripping the District's elected officials of their power."); David Hosansky, Measure for D.C. Review Board Awaits President's Signature, 53 CONG. Q. 14, at 1024 ("The bill would make the most sweeping changes to the District government since the 1973 Home Rule Act, which gave the District partial self-government.")

26. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that the District's racially segregated school system violated the implied equal protection guarantee of the Fifth Amendment's due process clause).

27. Once outside the District's constitutionally-mandated borders, the District government, and, by implication, the United States, would be required to share jurisdiction with those states, unless there was consent to give the United States exclusive jurisdiction.

28. See Transfer of Lorton Reformatory to the District of Columbia: Hearings on S. 1243 Before the Subcomm. on National Penitentiaries of the Sen. Comm. on the Judiciary, 94th Cong., 1st Sess., 15 (1975).

29. See United States v. District of Columbia, 788 F.2d 239 (4th Cir.1986).

30. The claims of some states to western lands obtained by grants from Great Britain initially proved to be a major impediment to the formation of the Republic. The six states without western territories had refused to join the Confederation unless the seven landed states ceded their claims. In essence, the unlanded states feared that the landed states would dominate the national government if they were permitted to retain control over their unsettled western expanses. The Maryland Legislature's instructions

ment's authority over the ceded lands proved problematic, however, because the Articles of Confederation expressly prohibited the national government from holding the states' western territories.[31] The Property Clause of the Constitution, adopted a decade later, was specifically designed to remedy this deficiency.[32]

■■■ Today, as interpreted by the federal courts, the federal government's authority over publicly owned land is sweeping in scope. Under the Property Clause, "[t]he power over the public land thus entrusted to Congress is without limitations."[33] Consistent with these powers, Congress may control the occupancy and use of the public lands,[34] protect the public from hazardous conditions on those lands,[35] and regulate wildlife on those lands.[36] The Property Clause permits the states to enjoy general jurisdiction over federal land within their borders, subject to the limitations of the Supremacy Clause, U.S. Const., Art. VI, § 2.[37]

■■■ The Property Clause and Enclave Clause provide separate mechanisms by which the federal government may obtain, hold, and regulate its property. Federally acquired property that does not satisfy the requirements of the Enclave Clause—such as state consent—nevertheless may fall under the federal government's power under the Property Clause. The Enclave Clause in no way diminishes the government's power over federal property held pursuant to the Property Clause.[38]

to its state's delegates cogently reflected this grave concern:

We are convinced policy and justice requires that a country unsettled at the commencement of this war, claimed by the British crown, and ceded to it by the Treaty of Paris, if wrested from the common enemy by the blood and treasure of the Thirteen states, should be considered as a common property subject to be parcelled out by Congress into free, convenient and independent governments in such manner and at such times as the wisdom of the assembly shall hereafter direct.

14 Journals of the Continental Congress 621–22 (1779).

31. The Articles of Confederation, which were adopted by delegates from the thirteen original states on November 15, 1777 and ratified on March 1, 1781, failed to empower the national government to own and manage land within the former colonies. In fact, Article IX of the Articles of Confederation stated that: "no State shall be deprived of territory for the benefit of the United States."

32. In his Commentaries on the Constitution, Joseph Story discussed the need for federal power over acquired real property: "As the general government possesses the right to acquire territory, either by conquest, or by treaty, it would seem to follow, as an inevitable consequence, that it possesses the power to govern, what it has so acquired." Joseph Story, Commentaries on the Constitution 3, § 1318 (1833).

33. *United States v. City and County of San Francisco*, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940) (quoted by *California Coastal Comm'n v. Granite Rock, Co.*, 480 U.S. 572, 580, 107 S.Ct. 1419, 1424–25, 94 L.Ed.2d 577 (1987); *Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 2291–92, 49 L.Ed.2d 34 (1976)).

34. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405, 37 S.Ct. 387, 389–90, 61 L.Ed. 791 (1917)

35. *Camfield v. United States*, 167 U.S. 518, 525, 17 S.Ct. 864, 867, 42 L.Ed. 260 (1897).

36. *Kleppe*, 426 U.S. at 540–41, 96 S.Ct. at 2292–93.

37. *See Kleppe*, 426 U.S. at 543, 96 S.Ct. at 2293–94 (citing *Silas Mason Co. v. Tax Comm'n of Washington*, 302 U.S. 186, 197, 58 S.Ct. 233, 238–39, 82 L.Ed. 187 (1937); *State of Ohio v. Thomas*, 173 U.S. 276, 283, 19 S.Ct. 453, 455, 43 L.Ed. 699 (1899)).

The Supremacy Clause provides that:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

38. Joseph Story acknowledged that the two Clauses labor independently of each other:

[T]he power of Congress to regulate the other national property [within existing states] (unless it has acquired by cession of the States exclusive jurisdiction) is not necessarily exclusive in all cases. If the national government owns a fort, arsenal, hospital, or light-house establishment, over which exclusive jurisdiction has not been acquired by cession of the state, the general jurisdiction of the State is not excluded in regard to the site, but, subject to the rightful exercise of the powers of the national government, it remains in full force.

The independent relationship of the Enclave Clause and the Property Clause compels the conclusion that the Property Clause empowers Congress to regulate and control Lorton. It is undisputed that the United States holds legal title to Lorton in fee simple; in fact, Congress specifically required that condition as a prerequisite for appropriating the funds used to purchase the nine parcels of property on which Lorton stands. Further, the federal government exercises plenary power over the District. That plenary power necessarily encompasses the lesser power to imprison persons convicted of crimes in the District. In essence, then, because Lorton is federal property, the Property Clause authorizes the federal government to exercise broad control over it for needful purposes, one of which is the plenary power to operate and manage the District. Accordingly, the statutes challenged in this case, which pertain to the federal government's delegation of operational authority and control over Lorton to the District, supersede any and all conflicting Virginia laws, irrespective of whether Lorton satisfies the requirements of a federal enclave.

▮ To forestall this conclusion, Virginia contends that the property interests of the United States in this case are too insubstantial to support the exercise of federal power under the Property Clause. In particular, Virginia relies on the principle established in *United States v. Walter*, 263 U.S. 15, 44 S.Ct. 10, 68 L.Ed. 137 (1923), that "some actual and substantial interests of the federal government" must be involved to support application of the Property Clause.[39] As support for this position, Virginia claims that the District: (i) purchased Lorton with its own funds; (ii) operates Lorton; (iii) has previously been found liable for its management of Lorton; and (iv) fully enjoys and exercises the traditional rights of property ownership over Lorton.

Virginia's contention that the federal government has "no substantial property interest" in Lorton is unpersuasive. The record plainly shows that the property on which Lorton stands was purchased with congressionally appropriated federal funds and that the United States holds title to it. Further, even though the District government operates Lorton, Congress could alter that arrangement at any time and require that the Executive Branch assume control over the prison. None of Virginia's arguments alter the basic fact that the District may possess and use Lorton only as long as Congress permits it to do so. The District is subject to the plenary control of Congress,[40] so, it is insignificant that the District operates Lorton. In the final analysis, Virginia's reliance upon *Walter* and its progeny to escape the reach of the Property Clause is of no avail.

▮ Virginia also contends that the Enclave Clause limits the scope of the Property Clause. This contention fails for it finds no support in the text of either Clause and is flatly contradicted by settled authority holding that the Enclave Clause imposes no limits on Congress' authority under the Property Clause. Indeed, in *Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 2291–92, 49 L.Ed.2d 34 (1976), the Supreme Court considered and rejected a claim quite similar to the claim asserted by Virginia in this action. In *Kleppe*, the State of New Mexico challenged the constitutionality of a federal statute designed to protect "unbranded and unclaimed horses and burros on public lands of the United States." New Mexico, like Virginia here, contended that the statute was "an impermissible intrusion on the sovereignty, legislative authority, and police power of the State." *Id.* at 541, 96 S.Ct. at 2292. Similarly, New Mexico argued that, under the Enclave Clause, "Congress could obtain exclusive jurisdiction over the public lands in the State only by state consent, and that in the

Joseph Story, Commentaries on the Constitution, 3, § 1322 (1833).

**39.** *See United States v. Davis*, 872 F.Supp. 1475, 1484 n. 28 (E.D.Va.1995) (quoting *United States v. Brown*, 384 F.Supp. 1151, 1157 (E.D.Mich. 1974), *rev'd on other grounds*, 557 F.2d 541 (6th Cir.1977)), *aff'd*, 98 F.3d 141 (4th Cir.1996).

**40.** *See Carter*, 409 U.S. at 429, 93 S.Ct. at 608–09 (citing Art. I, § 8, cl. 17, of the Constitution); *Northern Pipeline Construction Co.*, 458 U.S. at 75, 102 S.Ct. at 2874 (holding that Congress has "entire control" over the District "for every purpose of government").

absence of such consent Congress lacks the power to act contrary to state law." *Id.* The Supreme Court dismissed these claims as meritless, reasoning that because the purpose and function of the two Clauses were separate and distinct, the Enclave Clause's state consent or cession provision does not limit the federal government's powers under the Property Clause. In the words of the *Kleppe* opinion, the provision for state consent or cession in the Enclave Clause "has nothing to do with Congress' powers under the Property Clause."[41] From this principle it followed in *Kleppe* that the federal statute protecting unbranded and unclaimed horses and burros on federal property in New Mexico was neither an impermissible intrusion on the state's sovereignty, nor an exercise of legislative power barred by the Enclave Clause. The same result obtains here: Virginia's reliance on the Enclave Clause is misplaced because the power to regulate Lorton under the Property Clause exists independently of, and without limitation by, the Enclave Clause. Thus, the District's operation of Lorton, which is authorized by the federal government under the Property Clause, is neither an impermissible intrusion on Virginia's sovereignty, nor an exercise of power barred by the Enclave Clause.

Accordingly, Counts I and II of Virginia's complaint fail to state claims upon which relief may be granted.

### III

Virginia also alleges that the U.S. Attorney General's authority to designate Lorton as a place of confinement for the District's offenders is beyond the scope of power granted by the Constitution and federal law. Specifical-

ly, Virginia argues that since neither the Enclave Clause nor the Property Clause authorizes D.C. to operate a prison in Virginia, the Attorney General should be enjoined from sending prisoners there. This argument fails in light of the conclusion that the Property Clause furnishes Congress with the necessary authority to direct the Attorney General to send convicts to Lorton.

Accordingly, Count III of Virginia's complaint fails to state a claim upon which relief may be granted.

### IV

One final point merits mention. Citing the frequency of inmate escapes, the drug trafficking within its walls, official corruption, and the dilapidated conditions of its buildings, Virginia argues vigorously that Lorton should be closed. This argument, however well-founded factually or however sound as a matter of public policy, is not of constitutional status; it is a public policy argument more appropriately addressed to Congress.[42] And nothing in this Memorandum Opinion should be construed as addressing the merits of this argument. The key to closing Lorton is to be found not in the Constitution but in the public arena; it is a political question, not a constitutional issue.

For all of the foregoing reasons, defendants' motion to dismiss must be granted, plaintiff's motion for summary judgment must be denied, and this action must be dismissed in its entirety.

---

**41.** The entire passage, central to the Supreme Court's holding, is worth quoting:

> Appellees' claim confuses Congress' derivative legislative powers, which are not involved in this case, with its powers under the Property Clause. Congress may acquire derivative legislative power from a State pursuant to Art. I, § 8, cl. 17 of the Constitution by consensual acquisition of land, or by nonconsensual acquisition followed by the State's subsequent cession of legislative authority over the land.
>
> \* \* \* \* \* \*
>
> But while Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or

absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause. Absent consent or cession, a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause.... And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

*Id.* at 541–43, 96 S.Ct. at 2293.

**42.** *See supra* note 5 (discussing Virginia Senator Scott's legislative efforts to transfer operational control over Lorton to the federal government).