STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-198
GAB-YOR - 7/9/2001

KATAHDIN INSURANCE GROUP,

Plaintiff

v.

DECISION AND ORDERS

KIMBERLY M. ELWELL,

Defendant

Pending before the court are the following:

Defendant's Motion for Summary Judgment;
Plaintiff's Motion for Partial Summary Judgment; and
Plaintiff's Motion for Attachment and Attachment on Trustee Process.

Following hearing, the Defendant's Motion is Denied and the Plaintiff's are

Granted as set out below.

## FACTUAL BACKGROUND

On or about August 8, 1988, Defendant Kimberly Elwell became employed as a

licensed insurance agent for Insurance Associates. PSMF ¶ 3. At this time, Elwell

entered into an employment agreement. PSMF ¶ 4. From August 8, 1988 to March

1996, Elwell was employed in the Buxton office of Insurance Associates. PSMF ¶ 8.

At this time, Elwell was one of several insurance agents in the office, including the

owner, P. Donald Raymond, who was not an active producer. Elwell was given the

responsibility of servicing existing business and writing new business. PSMF ¶ 9.

On or about April 1, 1996, Katahdin Insurance Group("Katahdin") purchased the assets of Insurance Associates, including any and all interests in employment agreements between Insurance Associates and its existing employees. PSMF ¶ 5. Also on April 1, Katahdin entered into an Assignment and Assumption of Agreements assigning Elwell's employment agreement with Insurance Associates to Katahdin. PSMF ¶ 6.

Paragraph 13 of Elwell's Employment Agreement states that:

> 13. <u>Binding Nature of Agreement</u>. This agreement shall inure to the benefit of and be binding upon and enforceable against the heirs, legal representatives and assigns of Employee and the successors and assigns of Associates. This Agreement shall be controlled by and construed and enforced in accordance with the laws of the State of Maine. PSMF ¶ 13.

Between March 1996 and May 31, 2000, Elwell remained in the Buxton office and was employed by Katahdin Insurance Group, d/b/a Insurance Associates. During her first year of employment for Katahdin, she was one of two licensed agents in the office. During the next three years, Elwell was one of three licensed agents in the office. PSMF ¶ 10. Raymond, who worked part-time and Martha Davis, who also occupied the position of bookkeeper, were the other two agents. During the four years Elwell was employed by Katahdin, its owners, Carter and Mary Hall of Patten, Maine, entrusted the operations of the Buxton office to Elwell, who also occupied the position of office manager. PSMF ¶ 11. Elwell was responsible for writing the bulk of the business of the office. PSMF ¶ 10. The majority of the business of Katahdin is local, in the Buxton, Dayton, Scarborough, Gorham, Standish and Limington areas. PSMF ¶ 12.

2

From August 8, 1988 to May 31, 2000, Elwell had access to and regularly utilized confidential customer data concerning Katahdin's business, and was responsible for customer good will on behalf of her employer. PSMF ¶ 13.

Paragraph 5 of Elwell's employment agreement provides as follows:

> 5. Confidential Information. Employee acknowledges that, in the course of his employment hereunder, he will become acquainted with confidential information belonging to Associates relating to Associates business. This information relates to persons, firms, corporations and other entities which are or become customers or accounts of Associates or are insurance policies or expirations written through Associates' Offices during the term of this Agreement ("Associates Customers"), and sources with which insurance is placed, including but not limited to, the names of customers, policy expirations dates, policy terms, conditions and rates, and familiarity with customers' risks. Employee agrees that he will not, without the prior written consent of Associates, disclose or make any use of such confidential information for his benefit or the benefit of any party other than Associates except as may be required in the course of his employment hereunder. PSMF ¶ 14. (emphasis added).

Paragraph 7 of Elwell's employment agreement provides as follows:

> 7. Noncompetition for Certain Associates' Customers. Upon the termination of Employee's employment hereunder for any reason whatsoever, whether by Associates or Employee and whether with or without cause, Employee agrees that for a period of three (3) years following such date of termination he will not, without the prior written consent of Associates, directly or indirectly, solicit or accept insurance or bond business from, or perform any services included within the Associates Business for, any Associates' Customer with whom he has had business or personal relations during the term of this Agreement. PSMF ¶ 15. (emphasis added).

Paragraph 8 of the Elwell employment agreement provides as follows:

> 8. Organizing Competitive Businesses; Soliciting Company Employees. Employee agrees that so long as he is working for Associates he will not undertake the planning or organizing of any business activity competitive with Associates' business or the services he is obligated to perform pursuant to this Agreement. Employee agrees that he will not, for a period of three (3) years following termination of employment with Associates, directly or indirectly, solicit any of Associates' employees to work for Employee or any other competitive company. PSMF ¶ 16 (emphasis added).

Paragraph 9 of the Elwell employment agreement provides as follows:

3

9. <u>Certain Commissions and Fees</u>. If any commission, fee or other income becomes payable to Employee or to any person, firm or corporation by whom Employee is then employed as a result of any violation by Employee by the provisions of Paragraphs 5, 6, 7, and 8 of this Agreement, Employee agrees to pay, or to cause his new employer or competing business to pay, promptly to Associates an amount equal to such commission or fee. **PSMF ¶ 17.**

In a further effort to maintain the confidentiality of customer of information, in March, 2000, Carter Hall distributed to employees a Confidentiality and Non-Disclosure Policy requiring that all employees keep confidential and not disclose, during their employment and thereafter, customer and business information of the agency, and required employees, including Elwell, to initial the policy to indicate their acknowledgement. PSMF ¶ 18.

In April 2000, Elwell wrote Carter Hall and advised him that she had decided to open her own insurance agency and offered to purchase what she referred to as her "book of business" and the house account's "book of business" in the Buxton office. Carter Hall did not accept her offer. PSMF ¶ 19. In April 2000, Elwell procured a copy of Katahdin's producer list to utilize for her own purposes, and did not return that list until May 23, 2000 in response to Carter Hall's May 17, 2000 written demand. The producer list contained customer information including customer code, policy number, expiration date and premium amount. PSMF ¶ 20.

On May 5, 2000, Elwell left the Buxton office and advised her co-worker, Martha Davis, that she was going to an appointment in Biddeford to rent office space for her prospective competing business. PSMF ¶ 21. Elwell did in fact make arrangements at this time to rent her new office space. Id. Also during May 2000, while still employed by Katahdin, Elwell contacted numerous insurance company

4

representatives in order to obtain agency appointments for her new business. PSMF ¶ 22. These contacts resulted in Elwell obtaining agency appointments from at least eleven insurance companies. PSMF ¶ 23. During the last two months of Elwell's employment with Katahdin, she also telephoned software vendors for rating packages for use in her new office. PSMF ¶ 24.

In early June 2000, Elwell opened an insurance agency in Hollis, Maine, approximately three miles away from Katahdin's Buxton office. PSMF ¶ 25. Upon opening her new business, Elwell sent out business cards reading "Kimberly M. Elwell, Insurance" to approximately 20 or 30 of Katahdin's customers. PSMF ¶ 26. She also sent a handwritten note to at least some of these customers advising them to call her if they needed her. Id. Since June 2000, Elwell has advertised her insurance business in "Old Home Days," published in Buxton, and the "Smart Shopper," a flyer published weekly in the Buxton area. PSMF ¶ 27.

As of November 16, 2000, Elwell had obtained insurance business from 141 former customers of Katahdin. The premiums generated by this business as of November 16, 2000 totaled $252, 022.76 and Elwell's agency commissions totaled $27,39792. PSMF ¶ 28. Elwell has not paid any commissions, fee or other income to Katahdin since she left her employment with Katahdin. PSMF ¶ 29.

In a three count Complaint, Katahdin alleges breach of contract (Count I), breach of fiduciary duty (Count II) and misappropriation of trade secrets (Count III). Katahdin is requesting damages and an injunction enforcing the terms and provisions of the employment agreement. Katahdin has filed a Motion for Partial Summary Judgment on Count I. Elwell has filed a Motion for Summary Judgment.

5

**Defendant's Motion for Summary Judgment:**

*Was the employment agreement effectively assigned?*

Defendant argues that the employment agreement was not effectively assigned because (i) Elwell did not consent to the assignment; (ii) the provisions of the employment agreement that Katahdin is attempting to enforce were not assigned and; (iii) no novation was entered into. All of these arguments fail.

The Law Court has stated that: "an executory contract for personal services, or a contract otherwise involving personal credit, trust, or confidence, cannot be assigned by the sole act of one of the parties thereto." Salmon Lake Seed Co. v. Frontier Trust Co., 153 A. 671, 673, 130 Me. 69 (1931). Defendant argues that the contract at issue is one for personal services and Elwell did not consent to the assignment of the contract. However, assuming that Elwell's contract is one for personal services[1] the plain language of paragraph 13 of the employment agreement makes clear that Elwell gave her express consent to the assignment of the agreement. Paragraph 13 plainly states that the employment agreement shall " . . . inure to the benefit of . . . the successors and assigns of [Insurance] Associates." Unambiguous contract language is interpreted according to its plain and commonly

---

[1] A personal services contract involves the "exercise of individual skill and judgment, which can be performed only by the person named." Pinkham v. Libbey, 45 A. 823, 824 (Me. 1900). An example of a personal service contract is where an artist is engaged to paint a portrait - this type of contract cannot be assigned because it involves the unique talents of the artist and assigning the contract affects the adequacy of the product bargained for. Motel Services v. Central Maine Power Co., 394 A.2d 786, 789 (Me. 1978).

accepted meaning. <u>Seashore Performing Arts Center, Inc. v. Town of Old Orchard Beach</u>, 676 A.2d 482, 486 (Me. 1996).

In addition, paragraph 10 of the agreement contains a severability clause which provides that "if any paragraph or term of this Agreement is rendered invalid or unenforceable by judicial, legislative or administrative action, the remaining provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated." Therefore, even if the employment provisions of the employment agreement are not assignable, or were not effectively assigned, the assignment clause contained in paragraph 13 remains applicable to the non-competition provision of the agreement.[2]

It appears that the Law Court has not addressed the issue of the assignability of non-competition agreements. Other courts that have addressed the issue of the assignment of non-competition agreements have held that covenants not to compete are freely assignable. <u>See</u> e.g., <u>Managed Health Care Associates Inc. v. Kethan</u>, 209 F.3d 923, 928-30 (6th Cir. 2000); <u>Equifax Services, Inc. v. Hitz</u>, 905 F.2d 1355, 1361 (10th Cir. 1990); <u>Reynolds and Reynolds Co. v. Tart</u>, 955 F.Supp. 574, 556-57 (W.D.N.C. 1997); <u>Norman Ellis Corp. v. Lippus</u>, 176 N.Y.S.2d 5 (N.Y. Sup. Ct. 1955).

---

[2] The Sixth Circuit has noted that a personal services contract requires that one of the parties be bound to render personal services. In contrast, a noncompetition clause only requires that one of the parties abstain from certain activities. <u>Managed Health Care Associates v. Kethan</u>, 209 F.3d 923, 929 (6th Cir. 2000). As well, the Tenth Circuit has noted that a contract consists of a bundle of rights and whether rights are assignable depends on the particular rights and duties at issue. <u>Equifax Services, Inc. v. Hitz</u>, 905 F.2d 1355, 1361 (10th Cir. 1990). Therefore, although an employee's duty to perform under an employment contract generally is not delegable, a covenant not to compete generally is assignable. <u>Id</u>.

Therefore, because non-compete provisions are freely assignable and Elwell expressly consented to the assignment of her employment contract, the contract was effectively assigned.

Elwell next contends, that even if her employment agreement was assigned to Katahdin, the non-compete provisions of the employment agreement that Katahdin is attempting to enforce were not assigned. Paragraph 1.1(d) of the purchase of assets agreements provides:

> [Associates] reserves the right and retains such interests in these employment agreements as shall be reasonably required to permit Seller to enforce the confidentiality and noncompetition provisions thereof, but only in the event of any termination of employment of said employees by or from the employ of Purchaser. (emphasis added).

Furthermore, Elwell points to paragraph 2.2 of the purchase of assets of agreement, which states:

> Seller hereby releases all its existing employees who are in fact employed by Purchaser following the Closing, while they remain in the employ of the Purchaser, from the restrictions under their existing employment agreements with Seller relating to nondisclosure of confidential information or non-competition as to the Insurance Business being sold hereunder.

Elwell argues that the language in these two provisions makes clear that Insurance Associates retained the right to enforce the confidentiality and noncompete provisions, that is, Insurance Associates did not assign those rights to Katahdin.

However, the above language must be construed in light of the entire agreement. Paragraph 1.1(d) begins by stating that "Seller agrees to sell, to Purchaser, and Purchaser agrees to buy from Seller . . . [a]ny and all of Seller's interest in certain

8

employment agreements between Seller and those existing employees of Seller who will be employed by the Purchaser following the closing. . . . " In addition, the Assignment and Assumption of Agreements between Insurance Associates and Katahdin states that "Seller hereby assigns to Purchaser, to the extent assignable, and Purchaser hereby agrees to assume, the Employment Agreements attached hereto as Exhibit A, subject to the terms of the Asset Purchase Agreement."

The language of the Purchase of Assets Agreement and Assignment and Assumption of Agreements clearly indicates an intent to assign the entirety of the employment contract to Katahdin. The language of paragraph 1.1(d) referenced by Elwell, appears to be, as Katahdin contends, a "gap-filler" to ensure that, if "reasonably required" Insurance Associates could enforce the non-compete provisions in the employment agreement. For example, if Elwell had opened her office one day before the agreement between Insurance Associates and Katahdin was signed, Insurance Associates could enforce the non-compete provisions of the contract. Under the circumstances of the present case, where Katahdin is seeking to enforce its rights under the Agreement more than four years after the assignment, Insurance Associates' remaining interest in enforcing the Agreement is nil.

Paragraph 2.2 of the purchase of assets agreements releases Elwell from the non-compete provision of the contract insofar as she remains employed with Katahdin. Otherwise, she could not work for Katahdin without violating her employment agreement with Insurance Associates. It would appear that Insurance Associates and Katahdin dealt with this problem by having Associates release its

9

employees from the non-compete and confidentiality provisions, but only so long as they remained in the employ of Katahdin. If they left Katahdin, because the employment contracts were assigned, Katahdin could enforce the terms of the employment agreement. Therefore, the language of the Purchase of Assets Agreement and Assignment and Assumption of Agreements, taken as a whole, does not indicate that Associates retained any rights to enforce the confidentiality and noncompete provisions.

Finally, Elwell argues that the agreement was not effectively assigned because no novation was entered into. "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." RESTATEMENT (SECOND) OF CONTRACTS § 280 (1981). An assignment differs from a novation. Elwell cites Salmon Lake for the proposition that a new party can only be introduced into a new contract by novation, and therefore Katahdin was obligated to enter into its own agreement with Elwell. However, the plaintiff in Salmon Lake did not consent to the substitution of parties. Salmon Lake Seed Co. v. Frontier Trust Co., 153 A. 671, 673-74, 130 Me. 69 (Me. 1931) In the present case, Elwell consented to the assignment of the employment agreement. No case law could be found for the proposition that a novation is required for an effective assignment or that an assignment is ineffective absent a subsequent novation.

*Have the terms of the agreement expired?*

Elwell argues that even if the employment agreement was assigned, the agreement has not been transformed into an employment agreement between

Katahdin and Elwell that contains a noncompete provision with respect to *Katahdin's* customers. At best, Elwell argues, Katahdin only has the right to enforce the agreement on its terms, i.e. to the extent that it pertains to *Associates'* customers. Elwell argues that Katahdin cannot alter the agreement by substituting its name in the agreement wherever Associates' name appears. By the same token, Elwell argues, Katahdin could only enforce the agreement "for a period of three (3) years following termination of employment *with Associates. . ."* See ¶ 8 of employment agreement.

However, courts that have addressed this issue have held that when an agreement not to compete is assigned, the assignee may enforce the agreement as if it was the original contracting party. See e.g., Orkin Exterminating Co. v. Burnett, 146 N.W.2d 320, 327 (Iowa 1966); Peters v. Davidson, Inc., 359 N.E.2d 556, 562 (Ind. Ct. App. 1977). To do otherwise would deprive Katahdin of the benefit of its bargain with Insurance Associates. See Sevier Insurance Agency v. Willis Corroon Corp., 711 So.2d 995, 1000-01 (Ala. 1998)(stating that to deny a successor corporation the right to enforce employee's agreements not to compete would "ignore the reality that such agreements are often important assets that businesses intend to transfer during a purchase or merger").

*Has Insurance Associates' Dissolved?*

Elwell argues that pursuant to paragraph 3.1(h) of the Purchase of Assets Agreement, Insurance Associates was to liquidate and dissolve on or before March 31, 1997. Under Maine's "survival statute," Elwell argues that a dissolved

corporation has a two-year period within which to assert any and all of its claims - therefore any claims against Elwell would have had to be asserted before March 31, 1999. However, Insurance Associates still exists as a corporate entity.[3] In addition, because the employment agreement was validly assigned to Katahdin, Katahdin is now seeking to enforce agreement on its own behalf.

For the above reasons, Defendant's Motion for Summary Judgment is Denied.

**Plaintiff's Motion for Partial Summary Judgment (Count I)**

As a preliminary matter, the Law Court has stated that non-compete covenants "are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." Chapman & Drake v. Harrington, 545 A.2d 645, 647 (Me. 1988). Whether a noncompetition agreement is reasonable is a question of law to be determined by the court. Id. The reasonableness of a specific covenant must be ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected. Id. Protecting the employer simply from business competition is not a legitimate business interest to be advanced by such an agreement. Id. However, a covenant not to compete may be

---

3 Elwell cites Sturtevant v. Town of Winthrop, 1999 ME 84, 732 A.2d 264 , to support her position. However, in Sturtevant, the plaintiff had dissolved his corporation and the court found that there was no evidence to suggest that the corporation had assigned its rights to plaintiff. Id. ¶ 11 & n.4. The Law Court stated that even if there had been an assignment, it is doubtful that the plaintiff, as assignee of a corporate right could assert that right more than two years after dissolution. Id. This case is inapposite because there was an effective assignment of rights to Katahdin. As well, even if Insurance Associates had dissolved, the survival statute is intended to apply only to claims that accrued before the company dissolved. See 13-A M.R.S.A. § 1122(1). In the present case, the cause of action accrued four years after Katahdin purchased the assets of Insurance Associates.

reasonable when the employee during the term of his or her employment has had substantial contact with his/her employer's customers and is thereby in a position to take for his/her own benefit the good will his employer paid him/her to develop for the employer's business. Id. There is further support for the reasonableness of a covenant not to compete when the employee has had access to his or her employer's confidential information, including customer lists, and is in a position after leaving his/her employer to take advantage of that information. Id.

In the present case, Elwell does not challenge the reasonableness of the original covenant not to compete. Her primary argument, rather, is that her employment agreement was not effectively assigned. However, as explained above, the assignment of non-compete provisions is permissible and the assignment of Elwell's contract was clearly contemplated and Elwell consented to its assignment.

Elwell's employment agreement is unambiguous and prohibits Elwell from disclosing or making personal use of information relating to the business of Insurance Associates, including customer information. The agreement also prohibits Elwell from soliciting or accepting business from the customers of Insurance Associates for a period of three years following the termination of her employment and from undertaking the planning or organizing of any business activity competitive with the business of Insurance Associates during the course of her employment. Elwell has violated all of these provisions and has not, as she agreed in paragraph 9 of the agreement, paid to Plaintiff an amount equal to any commissions or fees payable to her as a result of these violations. Summary judgment is therefore granted on Count I (breach of contract).

13

Count 1 of the Complaint requests a "permanent injunction enforcing the terms and provisions of the [Employment] Agreement" and damages pursuant to paragraph 9 of the agreement.

Injunctive relief is appropriate when: (i) the plaintiff will suffer irreparable injury if the injunction is not granted; (ii) such injury outweighs any harm which granting the injunctive relief would inflict on the defendant; (iii) plaintiff has exhibited a likelihood of success on the merits and; (iv) the public interest will not be adversely affected by granting the injunction. Ingraham v. University of Maine at Orono, 441 A.2d 691, 693 (Me. 1982).

It would appear that Katahdin will suffer irreparable harm if Elwell is permitted to continue to engage in her competing business. Elwell was responsible for writing 95 percent of the business in Katahdin's Buxton office. PSMF ¶ 10; Defendant's Reply SMF ¶ 10. She was responsible for developing, cultivating and maintaining customer good will on behalf on her employer. PSMF ¶ 13; Defendant's Reply SMF ¶ 13. The majority of the Katahdin's business is local in the Buxton, Hollis, Dayton, Scarborough, Gorham, Standish and Limington areas. PSMF ¶ 12; Defendant's Reply SMF ¶ 12. In June 2000, Elwell left her employment with Katahdin and opened a competing insurance agency in Hollis, approximately three miles away from Katahdin's Buxton office. PSMF ¶ 25, Defendant's Reply SMF ¶ 25. Between June 2000 and November 16, 2000 - a period of less than six months - Elwell obtained insurance business from 141 former customers of Katahdin. PSMF ¶ 28; Defendant's Reply SMF ¶ 28.

14

A reasonable inference to be drawn from these facts is that Elwell has been successfully soliciting and accepting business from the customers she became acquainted with during the time she worked for Katahdin. Given her success in taking away business from Katahdin within the first six months following her departure, it is reasonable to conclude that Katahdin will suffer irreparable harm if a permanent injunction is not issued. The irreparable harm consists not only of lost commission income (to which the liquidated damage clause may apply) but also the "good will" which Katahdin has established with its customers over time. Ms. Elwell was the "face" of Katahdin Insurance in the community for a number of years. Customers no doubt came to rely on her for advice and good service. Katahdin may, if given the time and opportunity, replace Ms. Elwell with an equally competent agent and thereby retain its customer base. However, if Ms. Elwell is permitted to ignore her contractual obligations, she may capture most all of Katahdin's customers, who have come to rely on her, before Katahdin has a fair chance to replace her. Thus, the real magnitude of Katahdin's losses become much more difficult to calculate.

Plaintiff's injuries outweighs the harm that Elwell will suffer if the request for injunctive relief is granted. Elwell is free to compete generally in the insurance business so long as she does not utilize Katahdin's confidential business and customer information and misappropriate Katahdin's customers.

Finally, as set forth above, Katahdin has demonstrated "success on the merits." In addition, an injunction would not adversely affect the public interest.

15

The public interest is promoted by preserving the sanctity of the contact.

For the above reasons, Plaintiff's request for injunctive relief is granted.

The clerk may incorporate this order in the docket by reference.

Dated:     July 9, 2001

G. Arthur Brennan
Justice, Superior Court

Kate S. Debevoise, Esq. — PL
Robert W. Bower, Jr., Esq. — DEF

16